737 S.E.2d 490

**The STATE, Respondent,**

**v.**

**Miama KROMAH, Petitioner.**

Appellate Case No.2009–140328.

No. 27212.

Supreme Court of South Carolina.

Heard Sept. 20, 2012.

Decided Jan. 23, 2013.

342

Chief Appellate Defender Robert M. Dudek, of South Carolina Commission on Indigent Defense, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General William M. Blitch, Jr., all of Columbia; and Solicitor Daniel E. Johnson, of Columbia, for Respondent.

Justice BEATTY.

Miama Kromah ("Kromah") was convicted of (1) infliction of great bodily injury upon a child, and (2) unlawful neglect of a

child. Kromah appealed, arguing the trial court abused its discretion in permitting two of the State's witnesses to testify about actions they took after hearsay conversations they had with the three-year-old victim ("Child"), who did not testify at trial. The Court of Appeals affirmed, finding the issue was not preserved for review. *State v. Kromah*, Op. No. 2009–UP–322 (S.C. Ct.App. filed June 15, 2009). This Court granted Kromah's petition for a writ of certiorari. We affirm in result.

## I. FACTS

The victim in this case is Kromah's stepson, who was born on February 23, 2002 in Philadelphia. The Child initially lived with his biological mother. Child Protective Services eventually removed the Child from her care, and he lived with a foster family in Minnesota for most of his first three years.

Kromah married the Child's biological father, Musa Kromah, in March 2005. Three months later in June 2005, the Child, then three years old, came to Columbia to live with Kromah and her husband. In August 2005, just two months thereafter, the incident occurred for which Kromah was indicted for infliction of great bodily injury to, and unlawful neglect of, a child.

At trial, the evidence indicated Kromah brought the Child to the Lexington Medical Center, where he was examined in the triage area at around 2:23 a.m. on August 16, 2005. The Child was wearing a pull-up diaper and was crying. The Child had a cut on his scrotum, and his right testicle was hanging outside of the scrotum and was bloody. An emergency room nurse testified that Kromah told her that the Child's scrotum had just "busted open or tore open," and that Kromah initially appeared very calm despite the severity of the wound.

Dr. Sean O'Meara testified that he examined the Child in the emergency room around 2:35 a.m. on August 16, 2005. In addition to the above injury, he also noticed dried blood on the Child's mouth. Kromah told him that she thought the Child's scrotum appeared enlarged when she was giving him a bath, so she had applied pressure to it using a towel and then noticed the Child starting bleeding on the right side. Dr. O'Meara stated that, due to the severity of the wound, he

decided the Child needed surgery by a pediatric urologist, so he transferred the Child by ambulance to Palmetto Health Richland Hospital.

Dr. Erin Fields–Harris, a pediatric physician at Richland Hospital, who was qualified as an expert in pediatrics, examined the Child around 6:00 a.m. on August 16, 2005. She stated Kromah told her that, other than the pressure with the washcloth, there was no other trauma to the Child. However, the doctor noticed the genital injury consisted of a four to five centimeter, V-shaped laceration exposing the right testicle. In addition, she noticed bruising on the Child's face and an abrasion in the middle of his forehead. The Child also had lacerations on his upper and lower lip, and a red, swollen area along the abdomen near the inguinal crease where the torso meets the thigh, which she opined indicated a recent injury.

She stated when she asked the Child how the injury occurred, the Child "started to mouth something," but Kromah, who had been watching, interrupted the Child by coming over and asking him if he was okay and the Child never answered. She noticed this was the only time Kromah came over to the Child. Dr. Fields–Harris stated that, after observing the clean linear lines of the injury, she believed it was not consistent with Kromah's statements that she had only applied a washcloth to the area before the Child started bleeding. She told Kromah that there "appeared to be some traumatic injury to the patient" that was intentional and asked Kromah if she knew what caused it, but Kromah was not very responsive and just said "[t]hat she did not know."

Dr. Jennifer Amrol, a physician in the Children's Hospital at Palmetto Health Richland, testified that, in her expert opinion, the injury to the Child was the result of "non-accidental trauma or child abuse." She testified the injury was not accidental because the cut was "a very clean cut, [a] very straight line across the scrotum." She explained that if the Child was injured by accident, the wound would have had a ragged edge or tear.

Dr. Jeffery Thomas Ehreth, a pediatric urologist at Richland Hospital, testified that he performs about 850 surgeries a year and has extensive experience in cuts and lacerations. He

was qualified as an expert in pediatric urology, and he is one of only two pediatric urologists in South Carolina.

Dr. Ehreth testified the Child had a four-centimeter laceration transversing the scrotum, and he performed the surgery to repair it the same day he examined the Child on August 16, 2005. The Child did have some fluid around the testicle, "a small hydrocele, but it was very small, certainly not pathological or a problem." Dr. Ehreth testified the Child's wound "looked like a scalpel incision," as it went through the skin and the underlying muscle area. He said there was no evidence of a stellate form and rough edges as would be present in an ordinary injury. Rather, Dr. Ehreth stated in his expert opinion that the wound had to be caused by a sharp instrument, such as a "scalpel, razor blade, steak knife, something very sharp." He noted the cut went across the grooves in the skin, so if it had been caused by pressure along a weak point in the skin, it would have occurred along the grooves, not *across* them. He opined that bleeding from the injury would be immediate and significant, and the pain would be severe.

Dr. Anne Abel, Medical Director of the Violent Intervention and Prevention Program in the Department of Pediatrics at the Medical University of South Carolina, testified that she was called in to consult on the case with Richland Hospital. Dr. Abel examined the Child around 7:30 p.m. on August 16th, after his surgery. She said his upper lip was pretty swollen and he had an injury inside his lip. She also noticed abrasions on his face and "a rather large bruise" about 4½ inches by 3½ inches on the lower right abdominal area, near his hip. The abdominal area was tender and swollen.

She did not remove his bandages after surgery, but she viewed pictures taken before the surgery and noticed the Child had a V-shaped wound with "very, very clean" edges that was several centimeters long. She stated the lip injury appeared to be caused, in her expert opinion, by blunt force trauma against the face, possibly a blow to the face with a hand or fist. She stated the injury to the mouth was not consistent with the Child biting his own lip. She opined that the abdominal area does not injure easily, so the bruising there was probably from a blow or "heavy pressure from a

hand or a foot holding the belly down in a very forceful manner."

Dr. Abel concluded the Child's injuries were the result of physical abuse and not accidental. She found the clean, linear cut and the "V" shape of the wound were significant because they indicated the wound was caused by "physical trauma with a sharp linear object" such as "a sharp knife, a sharp object, a scalpel like a surgeon uses, a razor, a box cutter, [or] something very sharp." She noted the laceration was "a grave bodily injury, which required surgical repair," as the cut went through all layers of the scrotal sack. Dr. Abel testified that, even if pressure had been applied to the area, the Child's scrotum would not "explode," and she had never heard of such a theory of injury. Moreover, even if this happened, or if the area were manually torn, it would have multiple openings with ragged edges, not a clean linear cut. She concluded the wounds were not consistent with the version of events that Kromah had reported to medical personnel.

An investigator with the Richland County Sheriff's Office, Roy Livingston, testified that Kromah had given a statement acknowledging that she was the only person at home with the Child when he was injured, but she denied cutting him.

Kromah reiterated at trial the version of events she had previously given at both hospitals and to law enforcement and denied that she had intentionally injured the Child. Kromah testified that she got off work from the Brian Center, where she worked as a nursing assistant, at 11 p.m. on August 15, 2005 and she picked up the Child from her sister's house and took him to her home on St. Andrews Road, about ten minutes away. The sister had been watching the Child for her. She noticed no blood on the Child at any time prior to taking him home and he slept on the way home.

As Kromah got ready to give him a bath, she noticed the Child's scrotum was swollen, and the Child made a face and said he "hurt." She placed him in the tub and then tried to put pressure on the area with a warm washcloth. When she removed the cloth, she then noticed blood in the bathtub. She placed a pull-up diaper on the Child, then replaced it with a second one due to continued bleeding and took him to Lexington Memorial Hospital.

Kromah denied that she had cut the Child and stated she had no explanation as to what caused his testicle to be hanging outside of the scrotum. She maintained he was biting his lip on his way to the hospital, so that's when the injury to his lip occurred, and she stated she did not notice the abdominal bruising, just the swelling. She insisted that the only thing she had done was to apply pressure with the washcloth to the area that was already swollen and she had not pressed down on the Child with a razor or other sharp object.

The Child did not testify. Although DSS had taken the Child into emergency protective custody after the injury, DSS returned the Child to the father, Kromah's husband, in January 2006. Shortly before the trial began in June 2006, Kromah's husband sent the Child to live with the Child's grandmother in Liberia, which is where Kromah and her husband were born. Kromah and her husband were still together at the time of trial.

A jury convicted Kromah of inflicting great bodily injury upon, and unlawful neglect of, a child. Kromah was sentenced to concurrent prison terms of eighteen years and ten years, respectively.

Thereafter, Kromah filed a motion for a new trial or for reconsideration of her sentences. A hearing was held on the motion on December 19, 2007. At the hearing, Kromah admitted that she had lied at trial when she said she did not know how the Child's injuries occurred. Kromah now maintained that she had caused the injury, but that it was an accident.

Kromah testified the Child did not want a bath and she was "agitated" because he was not cooperating, so she had "handled him roughly." Kromah stated she accidentally scratched him with her long acrylic fingernails when she was washing him, as the nails had sharp edges. She initially stated that she did not know what could have caused the bruising on his abdomen, but later acknowledged that she "probably" did apply sufficient force to cause the bruising on his stomach.

Kromah also presented the Child as a witness, who testified that Kromah hurt him when she was bathing him, but he did not see anything in her hand when the injury occurred and she did not hold him down. He was asked if he had bit his

own lip because he hurt and because he was mad, to which he answered "yes." The trial court denied the motion for a new trial or a reduced sentence.

Kromah appealed, asserting the trial court erred in permitting two of the State's witnesses to testify about actions they took based on hearsay statements made by the Child, who was incompetent to testify at trial. The Court of Appeals affirmed, finding the issue unpreserved. *State v. Kromah*, Op. No. 2009–UP–322 (S.C. Ct.App. filed June 15, 2009). This Court granted Kromah's petition for a writ of certiorari.[1]

## II. STANDARD OF REVIEW

"The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* at 429–30, 632 S.E.2d at 848.

## III. LAW/ANALYSIS

On appeal, Kromah challenges the admission of testimony by two State's witnesses, Heather Smith, a forensic interviewer, and Roy Livingston, an investigator. The State contends the Court of Appeals properly found Kromah's issue is not preserved for appeal. It further contends the trial court did not err in admitting the testimony, in any event, and even if there was error, it was harmless beyond a reasonable doubt. We find the issue was preserved and address the merits of the appeal in the interest of judicial economy. We hold there was no error in the admission of Livingston's testimony, and that any error in the admission of Smith's testimony was harmless beyond a reasonable doubt.

### A. Error Preservation

Kromah first contends the Court of Appeals erred in finding her issue was not preserved for review.

---

1. Other issues ruled upon by the Court of Appeals on which certiorari was denied are not before us.

At the beginning of the trial, Kromah moved that the State's witnesses be prohibited from testifying about any statements made by the Child to them. Kromah asserted the Child was unavailable to testify because he had been removed from the country, and before the Child's hearsay statements could be introduced through other witnesses, the Child must have been deemed a competent witness. Kromah stated she believed the Child probably was not competent based on his responses during a videotaped interview with the Assessment and Resource Center ("ARC").[2] During the ensuing colloquy, the trial court noted that, under Rule 601, SCRE, children are presumed to be competent unless it is shown otherwise. The trial court stated some of the proposed testimony was not hearsay and that it would reserve its ruling at that time as to potential hearsay issues.

Just prior to Smith taking the stand, the trial court viewed the one-hour videotape of the Child being interviewed by Smith. The trial court ultimately agreed with Kromah that the Child's statements to her could not be repeated at trial and advised the State, "You can't go into statements that were made." The court stated it would take up other objections as they came up, but Kromah asked if they could hear what Smith would say now. Smith then testified in camera that she had interviewed the Child for about an hour, that investigator Livingston was there for part of the interview, and that based on the interview as well as other information and data available, her finding was compelling for child abuse. The trial court stated it "will permit that." Kromah again objected, and the trial court overruled the objection and reiterated that Smith would be limited to what had been gone over in camera.

Smith, a forensic evaluator and child therapist with ARC who was qualified without objection as an expert forensic interviewer of children, then testified before the jury as follows:

---

2. The interview was with Heather Smith, a forensic interviewer and child therapist with ARC, and was taken on August 25, 2005. ARC is a non-profit child abuse evaluation and treatment center in Richland County administered under the auspices of the South Carolina Department of Mental Health in collaboration with the USC School of Medicine Department of Pediatrics and Palmetto Health Children's Hospital. (SCDMH website, http://www.state.sc.us/dmh/arc.index.htm)

Q And once you—and **you can't say what was said** or wasn't said during that evaluation, but once the evaluation was complete and you got sufficient information, were you able to **make an assessment as to whether or not this was founded for child abuse?**

A Yes, I did.

Q And what was your conclusion, based on your evaluation of the child?

A Based on the interview that I conducted, as well as information provided by law enforcement and the child protective services worker, **I made a decision that the child had given compelling—a compelling finding.**

[Kromah]: Objection.

The Court: Overruled.

[Kromah]: Your Honor, may we approach? I apologize.

The Court: All right. Come up.

(Whereupon, a bench conference was held in the presence, but not within the hearing, of the jury.)

The Court: **The objection is sustained as to the form of that question.**

Please rephrase your question, solicitor.

[State]: Thank you, sir.

Q Ms. Smith, **your finding was compelling for child abuse or physical abuse?**

A For child physical abuse, yes.

A **And without saying what was said during the interview or anything else,** did you pass that information along to law enforcement officers including Investigator Livingston and other law enforcement agencies?

A Yes, yes, I did.

(Emphasis added.)

Livingston, an investigator in the Special Victims Unit of the Richland County Sheriff's Department, testified later in the trial. Livingston testified that he spoke extensively to Kromah and the Child's father, as well as to Kromah's sister, treating physicians, the responding officer, and a social worker. He stated that he had also spoken to the Child when he was in intensive care after his surgery:

Q And you can't say what [the Child] said, but what were you asking him about. Do not say what he said.

A I was asking what happened to him and who did it.

Q Was the child—you can't say what he said, but was he able to communicate with you?

A Yes, he was.

. . . .

Q And he related—was he able to relate information to you?

A Yes, he did.

Q And **based on your investigation at that point,** the next day did you arrest Miama Kromah?

A Yes, I did.

[Kromah]: Objection, Your Honor. That is an improper question based on that information. **We've already discussed this.** May we approach the bench?

The Court: Yes, sir. Come up.

(Whereupon a bench conference was held in the presence, but not within the hearing, of the jury.)

The Court: All right. The objection is overruled. You may continue, Solicitor.

Q Based on your investigation, what did you do the next day, Investigator Livingston?

A I placed Ms. Kromah under arrest.

(Emphasis added.)

The Court of Appeals held that, "[w]ith regards to Heather Smith's testimony, the objection did not specifically pertain to her reliance on the victim's statements, but rather addressed the form of the State's question." *Kromah,* op. at ——–——. The court further stated, "Similarly, the objection lodged during Investigator Roy Livingston's direct-examination did not address any alleged hearsay statement." *Id.* at ——.

■ As to Smith's testimony, we find the objection is preserved based on Kromah's objection immediately prior to Smith's testimony. The objection during the testimony was to the form of the question, and the objection was sustained, so Kromah received the relief she requested in that particular regard. However, the trial court's statement prior to her

testimony that he would allow her to testify as she did during the in camera exchange constituted a final ruling that preserved the hearsay issue for appeal since Smith's testimony immediately followed this ruling with no intervening testimony.

"Generally, a motion *in limine* is not a final determination; a contemporaneous objection must be made when the evidence is introduced." *State v. Wiles,* 383 S.C. 151, 156, 679 S.E.2d 172, 175 (2009). "There is an exception to this general rule when a ruling on the motion *in limine* is made 'immediately prior to the introduction of the evidence in question.'" *Id.* (quoting *State v. Forrester,* 343 S.C. 637, 642, 541 S.E.2d 837, 840 (2001)). "This exception is based on the fact that when the trial court's ruling is not preliminary, but instead is clearly a final ruling, there is no need to renew the objection." *Id.* at 156–57, 679 S.E.2d at 175; *see also State v. Mueller,* 319 S.C. 266, 268–69, 460 S.E.2d 409, 410–11 (Ct.App.1995) (noting where there is no evidence between the motion and the testimony, there is no basis for the trial court to change its ruling, so the decision is a final one).

As to Livingston, we also find the objection is preserved. Although the full grounds for the exception were not articulated on the record at the time of the objection, as would have been advisable to avoid a question in this regard, it nevertheless appears from the transcript and the context of the proceedings that Kromah's reference to the parties' earlier discussion sufficiently apprised the trial court of the nature of the objection. The trial court immediately appeared to understand the objection as a renewal of the previous hearsay argument advanced against the State's witnesses. *See State v. Byers,* 392 S.C. 438, 710 S.E.2d 55 (2011) (holding defense counsel's challenge to the evidence was presented with sufficient specificity to inform the circuit court of the point being urged as objectionable); Rule 103(a)(1), SCRE (stating for alleged errors in evidentiary rulings to be preserved, "a timely objection or motion to strike" must appear in the record "stating the specific ground of objection, *if the specific ground was not apparent from the context*" (emphasis added)).

## B. Admissibility of Testimony of Two State's Witnesses

Having found the issue preserved, we find it appropriate, in the interest of judicial economy, to consider the merits of Kromah's appeal instead of delaying the proceedings with a remand to the Court of Appeals.

██ Kromah argues the trial court abused its discretion by permitting State's witnesses Smith and Livingston to testify regarding the actions they took as a result of hearsay statements made by the three-year-old Child, who would have been incompetent to testify.[3]

Kromah asserts, "In this case, Smith was permitted to testify that following her conversation with the [C]hild, she turned the information over to law enforcement. Additionally, Livingston was permitted to testify that following his conversation with the [C]hild, he arrested petitioner the next day. Livingston's testimony was all the more damaging because he testified that he did not consider petitioner a suspect when he interviewed her the morning that he also interviewed the [C]hild."

Kromah essentially contends the trial court ruled the Child was not competent as a witness (based on the videotaped interview with the Child), so the Child's statements were inadmissible hearsay. Kromah then asserts the evidence offered by Smith and Livingston was unreliable and inadmissible because they relied upon their conversations with the Child in making their respective assessments (of child abuse and to arrest Kromah), citing *South Carolina Department of Social Services v. Doe*, 292 S.C. 211, 219–20, 355 S.E.2d 543, 548 (Ct.App.1987) (holding, in a case rejecting the use of a child's out-of-court statements in a prosecution for alleged sexual abuse, that "[t]he admission of hearsay under an exception to the rule presupposes the declarant is possessed of the qualifications of a witness in regard to competency, personal knowledge, and the like," and that "the declarant's competency is a precondition to the admission of his hearsay statements on grounds of unavailability").

---

**3.** To the extent Kromah additionally argues on appeal to this Court that the disputed testimony unfairly impugned her character, this argument was not preserved for appeal as it was not raised to and ruled upon by the trial court.

### (1) Investigator Livingston

The trial court basically agreed with Kromah's initial objections at trial and ruled the State's witnesses could not repeat what the Child had actually said to them since the Child was not there to testify. In reviewing Livingston's testimony, we disagree with Kromah that the disputed portion of his testimony constituted inadmissible hearsay.

The South Carolina Rules of Evidence define hearsay as follows:

> "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Rule 801(c), SCRE. "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." *Id.* Rule 801(a). The Hearsay Rule provides that "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court of this State or by statute." Rule 802, SCRE.

█ Livingston testified in detail about his investigative process and the numerous individuals he spoke to, including the Child, and that he made his decision to arrest Kromah based on *all* of this information. Livingston did not directly relate to the jury any statements made by the Child, and the defense had the opportunity to cross-examine Livingston extensively. Even as posed by Kromah in her issue on appeal, she challenges the testimony of the State's witnesses as to what *actions they took* in response to information they received from the Child. However, Livingston never revealed any of the Child's statements in the presence of the jury.

Moreover, even if Livingston's testimony were considered some form of *indirect* hearsay, we find the trial court did not abuse its discretion. Livingston's testimony referencing his interview of the Child, excerpted above, was only one part of the information he recited in his investigative process leading up to his conclusion that there was sufficient evidence to arrest Kromah, and we find his testimony in this regard was proper as he did not repeat what the Child said to him. *Cf. State v. Weaver*, 361 S.C. 73, 86–87, 602 S.E.2d 786, 792–93 (Ct.App.2004) (holding officer's testimony as to what his investigation revealed and his conclusion that all of the evidence led

to the defendant was proper where he did not repeat any statements actually made to him by individuals at the scene).

In addition, as mentioned at trial, Livingston's statement about the Child would appear viable as an excited utterance. The Child was interviewed while still under the influence of the traumatic events, as he was in intensive care after having had surgery for his injury when Livingston spoke to him. *Cf. State v. Sims*, 348 S.C. 16, 558 S.E.2d 518 (2002) (finding where a six-year-old suddenly stopped testifying that the trial court did not err in allowing a police officer to testify that the child had indicated who was in the apartment on the night his mother was fatally attacked and that it was the defendant; the testimony was admissible as an excited utterance under Rule 803(2), SCRE, even though some twelve hours had passed since the attack, as time is just one factor to consider, along with the declarant's demeanor and age, and the severity of the startling event, and even statements in response to an officer's questioning can be an excited utterance because the statements still have spontaneity, especially for a child, for whom stress can last longer than for an adult; the Court stated it is the totality of the circumstances that must be considered in this analysis). Similarly, under the totality of the circumstances, including the continuing stress of the incident, the Child's demeanor, and the traumatic nature of the event, we find the trial court did not abuse its discretion in allowing the disputed testimony here.

### (2) Forensic Interviewer Smith[4]

In contrast, we find Smith's testimony more problematical to the extent that she testified as to a "compelling finding" of physical child abuse.

---

4. The title of "forensic interviewer" is a misnomer. The use of the word forensic indicates that the interviewer deduces evidence suitable for use in court. It also implies that the evidence is deduced as the result of the application of some scientific methodology. The exact scientific methodology applied apparently defies identification. The RATAC style of interviewing is not scientific. It merely represents the objectives and topics of discussion between the interviewer and the child. Somehow RATAC is supposed to convert the interviewer into a human truth-detector whose opinions of the truth are valuable and suitable for the jury's consumption.

Smith is a forensic interviewer of children. "[A] forensic interviewer is a person specially trained to talk to children when there is a suspicion of abuse or neglect." *In re K.K.C.*, 728 N.W.2d 225, at *2 (Iowa Ct.App.2006). The job of the interviewer is not to provide therapy, but to collect facts. *State v. Borden*, 986 So.2d 158, 163 (La.Ct.App.2008). It has been said that a forensic interviewer's purpose is to prepare for trial. *See State v. Blue*, 717 N.W.2d 558, 564 (N.D.2006) (observing "[t]he forensic interviewer's purpose was undoubtedly to prepare for trial" as "[f]orensic by definition means 'suitable to courts,'") (quoting *Merriam–Webster's Collegiate Dictionary* 490 (11th ed.2005)); *Black's Law Dictionary* 721 (9th ed.2009) (stating "forensic" is derived from the Latin terms "forensis" (public) and "forum" (court) and defining "forensic" as "[u]sed in or suitable to courts of law or public debate"). Smith testified that she used the RATAC method of interviewing. This is an acronym for Rapport, Anatomy, Touch, Abuse Scenario, and Closure. RATAC is reportedly used nationwide in the forensic interviewing of children. *State v. Douglas*, 380 S.C. 499, 500, 671 S.E.2d 606, 607 (2009).

Smith was qualified as an expert and, although an expert's testimony theoretically is to be given no more weight by a jury than any other witness, it is an inescapable fact that jurors can have a tendency to attach more significance to the testimony of experts.[5] The label of expert should be jealously guarded by the court and never loosely bandied about.

---

5. In this case, there was no objection made to Smith's qualification as an expert, but we have previously observed that such qualification may be unnecessary. *See, e.g., Douglas*, 380 S.C. at 504, 671 S.E.2d at 609 (concluding it was unnecessary for the forensic interviewer to be qualified as an expert because no specialized knowledge was required there; the interviewer testified only as to her personal observations and experiences, and her interview with the victim; the Court found no error, however, noting the interviewer gave no opinion concerning the victim's veracity). In considering the ongoing issues developing from their use at trial, we state today that we can envision no circumstance where their qualification as an expert at trial would be appropriate. Forensic interviewers might be useful as a tool to aid law enforcement officers in their initial investigative process, but this does not make their work appropriate for use in the courtroom. The rules of evidence do not allow witnesses to vouch for or offer opinions on the credibility of others, and the work of a forensic interviewer, by its very nature, seeks to ascertain whether abuse occurred at all, i.e., whether the victim is telling the truth, and to identify the source of the abuse. Part

■ Rule 703 of the South Carolina Rules of Evidence allows an expert giving an opinion to rely on facts and data that are not admitted into evidence or even admissible into evidence if they are of a type reasonably relied upon by experts in the particular field. Rule 703, SCRE. The rule does not, however, make hearsay automatically admissible simply because it was relied upon by the expert. *See Allegro, Inc. v. Scully*, 400 S.C. 33, 46–47, 733 S.E.2d 114, 122 (Ct.App. 2012) ("However, Rule 703 does not allow the admission of hearsay evidence simply because an expert used it in forming his opinion; the rule only provides the expert can give an opinion based on facts or data that were not admitted into evidence.").

■ Further, even though experts are permitted to give an opinion, they may not offer an opinion regarding the credibility of others. It is undeniable that the primary purpose for calling a "forensic interviewer" as a witness is to lend credibility to the victim's allegations. When this witness is qualified as an expert the impermissible harm is compounded. Our courts have previously held that "[t]he assessment of witness credibility is within the exclusive province of the jury," and that witnesses generally are "not allowed to testify whether another witness is telling the truth." *State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct.App.2012); *see also* L.A. Bradshaw, Annotation, *Necessity and Admissibility of Expert Testimony as to Credibility of Witness*, 20 A.L.R.3d 684 (1968 & Supp.2012) (stating an expert witness should not vouch for the truthfulness of a witness). Specifically, it is

---

of the RATAC method, which is not without its critics, involves evaluating whether the victim understands the importance of telling the truth and whether the victim has told the truth, as well as the forensic interviewer's judgment in determining what actually transpired. For example, an interviewer's statement that there is a "compelling finding" of physical abuse relies not just on objective evidence such as the presence of injuries, but on the statements of the victim and the interviewer's subjective belief as to the victim's believability. However, an interviewer's expectations or bias, the suggestiveness of the interviewer's questions, and the interviewer's examination of possible alternative explanations for any concerns, are all factors that can influence the interviewer's conclusions in this regard. Such subjects, while undoubtedly important in the investigative process, are not appropriate in a court of law when they run afoul of evidentiary rules and a defendant's constitutional rights.

improper for a witness to testify as to his or her opinion about the credibility of a child victim in a sexual abuse matter. *State v. Hill*, 394 S.C. 280, 294, 715 S.E.2d 368, 376 (Ct.App. 2011); *cf. Smith v. State*, 386 S.C. 562, 564–65, 689 S.E.2d 629, 631 (2010) (observing the forensic interviewer interjected impermissible hearsay into the trial, which improperly bolstered the victim's testimony; the forensic interviewer testified that the victim told her that the defendant had sexually assaulted her and that she found the victim's statement "believable").[6]

In *State v. Jennings*, 394 S.C. 473, 716 S.E.2d 91 (2011), this Court held that the trial court erred in allowing the State to introduce portions of a forensic interviewer's written reports about interviews conducted with the three alleged minor victims. The Court stated, "In each report, the forensic interviewer stated that during the interviews, each child had 'provide[d] a compelling disclosure of abuse by [appellant].' " *Id.* at 480, 716 S.E.2d at 94 (alterations in original). The Court found this was error as "[t]here is no other way to interpret the language used in the reports other than to mean the forensic interviewer believed the children were being truthful." *Id.* Similarly, we find Smith's testimony about a "compelling finding" to be inappropriate here. Smith should not have been allowed to testify about a compelling finding of child abuse as that was the equivalent of Smith stating the Child was telling the truth.

---

**6.** In *Seward v. State*, 76 P.3d 805, 814 (Wyo.2003), the court found that a forensic interviewer's testimony about her use of "truthfulness criteria" and her assessment of the victim's credibility based on the content of the victim's interview responses was testimony that "directly vouched for the victim's credibility." The court stated, "It is evident that the purpose of [the interviewer's] testimony was twofold: establish the foundation for admitting her videotaped 'forensic interviews' with the victim and assess credibility of the victim's disclosure based on the content of those interviews." *Id.* The court noted that the interviewer herself had stated "the very purpose of a 'forensic interview' is to assess whether the victim's disclosure was 'credible or not'—a forensic interviewer is looking for 'elements that would support it either being a credible disclosure or a noncredible disclosure.' " *Id.* The court ultimately found that that State had not established that testimony of this nature assisted the jury in addressing an issue beyond the jurors' common experience. *Id.* at 816.

Because the admissibility of forensic interviews and the testimony based thereon at trial has been the subject of several recent appeals, we believe it would be helpful to set forth, by way of example, the kinds of statements that a forensic interviewer should avoid at trial: [7]

- that the child was told to be truthful;
- a direct opinion as to a child's veracity or tendency to tell the truth;
- any statement that indirectly vouches for the child's believability, such as stating the interviewer has made a "compelling finding" of abuse;
- any statement to indicate to a jury that the interviewer believes the child's allegations in the current matter; or
- an opinion that the child's behavior indicated the child was telling the truth.

A forensic interviewer, however, may properly testify regarding the following:

- the time, date, and circumstances of the interview;
- any personal observations regarding the child's behavior or demeanor; or
- a statement as to events that occurred within the personal knowledge of the interviewer.

These lists are not intended to be exclusive, since the testimony will of necessity vary in each trial, but this may serve as a general guideline for the use of this and other similar testimony by forensic interviewers.

Although we find the admission of the challenged testimony by Smith was error, we conclude any error is properly deemed harmless beyond a reasonable doubt.

An appellate court generally will decline to set aside a conviction due to insubstantial errors not affecting the result. *State v. Black,* 400 S.C. 10, 732 S.E.2d 880 (2012); *see also Arnold v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992) (stating error is harmless beyond a reasonable doubt if it did not

---

7. The General Assembly has enacted provisions allowing the admission of out-of-court statements by child sexual abuse victims under the age of twelve when certain conditions are met. *See* S.C.Code Ann. § 17–23–175 (Supp.2011); *State v. Bryant,* 382 S.C. 505, 675 S.E.2d 816 (Ct.App.2009) (discussing the proper application of this provision).

contribute to the verdict obtained); *State v. Watts*, 321 S.C. 158, 165, 467 S.E.2d 272, 277 (Ct.App.1996) ("In applying the harmless error rule, the court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such belief beyond a reasonable doubt." (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967))).

 Smith testified in camera that the Child told her he had been hurt and that Kromah was the perpetrator. However, Smith's challenged testimony before the jury was that child abuse occurred in this case, the essential portion of which was outlined above, and it did not go so far as to indicate that Kromah was the perpetrator of the injuries. Rather, Smith restated what the overwhelming evidence had already indicated, that the injury was the result of physical abuse. *Cf. Jennings*, 394 S.C. at 480, 716 S.E.2d at 94–95 (finding error in the admission of hearsay evidence and the forensic interviewer's report making a "compelling finding" of child abuse, interpreted to mean the interviewer found the children believable; the error was not harmless where "[t]here was no physical evidence presented in this case" and "[t]he only evidence presented by the State was the children accounts of what occurred and other hearsay evidence of the children's accounts").

According to her own testimony, Kromah was alone with the Child in the bathroom when the bleeding incident occurred, and he had not been bleeding prior to this time. Numerous medical experts testified that the Child's genital wound could not have been caused by an accidental injury. They reached this conclusion based on the pattern of the wound and the circumstances of the Child's injury (spontaneous bleeding along with straight-edged lacerations in a V-shape that were consistent with the Child being cut by a razor, knife, box cutter, or other sharp instrument). Thus, Kromah's statements that the Child spontaneously started bleeding after she applied a warm washcloth while giving him a bath and that she had no idea how the Child's testicle came to be protruding from the Child's scrotum are inconsistent with the overwhelming expert medical evidence in the record that the wound resulted from physical abuse.

In addition, there was evidence of other injuries to the Child, such as an abrasion on the forehead, lip lacerations, and abdominal bruising, all of which were recently inflicted and indicative of physical abuse. Based on the entire record, including the physical evidence documented in this case, the challenged testimony could not reasonably have affected the result of the trial, so any error in its admission was harmless beyond a reasonable doubt.

## IV. CONCLUSION

We find Kromah's issue on appeal is preserved and address it here in the interest of judicial economy. On the merits, Kromah has shown no abuse of discretion in the trial court's admission of Livingston's testimony, and any error in the admission of forensic interviewer Smith's testimony was harmless beyond a reasonable doubt. Consequently, the decision of the Court of Appeals, which upheld Kromah's convictions and sentences, is affirmed in result.

**AFFIRMED IN RESULT.**

TOAL, C.J., KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in result only.