The STATE, Respondent,

v.

Roy Lee JONES, Appellant.

Appellate Case No. 2014–001639
Opinion No. Op. 5428

Court of Appeals of South Carolina.

Submitted June 1, 2016
Filed July 20, 2016
Rehearing Denied August 18, 2016

320

Appellate Defender Lara Mary Caudy, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Deputy Attorney General Deborah R.J. Shupe, both of Columbia, and William Walter Wilkins, III, of Greenville, all for Respondent.

WILLIAMS, J.:

Roy Lee Jones appeals his convictions for one count of first-degree criminal sexual conduct (CSC) with a minor, one count of second-degree CSC with a minor, and two counts of lewd act upon a child. Jones argues the circuit court abused its discretion by allowing the State's witness to testify as an expert in child sex abuse dynamics because the subject matter of her testimony was not beyond the ordinary knowledge of the jury, the State failed to prove the reliability of the substance of her testimony, she improperly bolstered the victims' credibility, and her testimony was highly prejudicial. We affirm.

**FACTS/PROCEDURAL HISTORY**

During the period of sexual abuse, from 2004 to 2009, Jones lived with his longtime girlfriend (Mother) and her two daughters (Older Sister and Younger Sister) in different homes in Greenville County, South Carolina. Older Sister was fifteen years old and Younger Sister was ten years old when Jones first began molesting them.

On June 24, 2014, a Greenville County grand jury indicted Jones on two counts of first-degree CSC with a minor, five counts of second-degree CSC with a minor, and two counts of lewd act upon a child. The case was called for a jury trial on July 16, 2014.

Prior to trial, Jones informed the circuit court he intended to object to the admission of testimony from the State's

proposed expert, Shauna Galloway–Williams, on the ground that her testimony would improperly bolster the victims' credibility. The court indicated it would hear Jones's objection prior to the proposed expert testifying at trial. Subsequently, during jury qualification, the court asked if any of the jurors had been a victim, or had a close relative who had been a victim, of a sex crime. No jurors responded to the question. The court further asked if any jurors had been personally accused—or had a close relative who had been accused—of a sex crime and, again, no jurors responded.

At trial, Older Sister and Younger Sister (collectively "the Victims") described various incidents of abuse that started with Jones making inappropriate comments and fondling them, but eventually progressed to oral and vaginal intercourse. Older Sister testified that, when she tried to stop Jones, he would physically force her to comply, threaten to harm her and her family using witchcraft, and frequently offer her gifts and money to keep her from reporting the abuse. Older Sister stated Jones sexually abused her over one hundred times. In 2012, the Victims' aunt confronted Older Sister after Younger Sister disclosed that Jones had been molesting her. Following this conversation, Older Sister went to the police and reported that Jones had sexually abused her as well.

Younger Sister testified that Jones started sexually abusing her when she was going into the sixth grade. Jones's molestation began with fondling and progressed to vaginal intercourse, and Younger Sister ultimately contracted a sexually transmitted disease from him. After Jones beat Younger Sister for refusing to have sex with him, she told Mother that Jones had been molesting her. Mother, however, allowed Jones to continue living in the home and the molestation continued. Younger Sister also testified that Jones would give her money and then take it back after sexually abusing her. To prevent Younger Sister from reporting the abuse, Jones physically abused her and threatened to harm her family with witchcraft.

Subsequently, Mother testified regarding her relationship with Jones as well as the circumstances under which the Victims reported the molestation to her. According to Mother,

Jones denied the reports when she confronted him, and she wanted to believe Jones because she loved him. Mother was also concerned the Victims would be taken away from her if they went to the police. In September 2008, though, Mother took Younger Sister to a doctor's appointment and learned Younger Sister had contracted a sexually transmitted disease. The doctor asked Younger Sister if she was sexually active, and she just looked at Mother "asking if she should say." Later, when Mother confronted Jones at home, the two got into an argument and she left the house. Mother indicated she finally kicked Jones out of the home in 2010.

The circuit court then held an in-camera hearing during which the State proffered Galloway–Williams as an expert in child sex abuse dynamics to testify regarding delayed disclosures, the disclosure process, and behavioral characteristics of nonoffending caregivers. Galloway–Williams, the executive director of the Julie Valentine Center, testified as to her extensive training and qualifications in the area of child sexual abuse. On voir dire, Galloway–Williams was unable to recall specific citations to studies or articles addressing the reliability of delayed disclosure issues, but she indicated she could provide them and stated all of her training included the studies and articles as the basis of fact. Moreover, Galloway–Williams explained the textbook she uses to teach a class at the University of South Carolina Upstate referenced articles about delayed disclosures and nonoffending caregivers. In addition, Galloway–Williams confirmed that these issues are researched and published in articles in professional journals, subjected to peer review, and uniformly accepted and used by experts and professionals in counseling and treating child sex abuse victims.

Jones objected to Galloway–Williams testifying as an expert in child sex abuse dynamics, arguing the substance of her testimony was not beyond the ordinary knowledge of the jury or reliable. Jones further contended her testimony would improperly bolster the Victims' testimony and was highly prejudicial. The circuit court overruled Jones's objection, finding the proffered expert testimony is admissible in child sex abuse cases of this nature, and the subject matter of Galloway–Williams' testimony is outside the common knowledge of the public as well as the jury pool in particular.

Thereafter, the circuit court qualified Galloway–Williams as an expert in child sex abuse dynamics over Jones's objection and she testified before the jury. During her direct testimony, Galloway–Williams testified in general terms regarding delayed disclosures, the disclosure process, and the responses of nonoffending caregivers. Nevertheless, Galloway–Williams did not specifically reference the Victims or Mother. On cross-examination, Galloway–Williams stated she never met with any of the witnesses in this case, including law enforcement, and her only knowledge of the case came from discussions with the solicitor's office one month prior to trial.

After the circuit court denied Jones's motion for a directed verdict, he took the stand in his own defense and denied molesting the Victims. Jones testified that he was a large financial provider for the family and would give them all of his money. Jones claimed he eventually "got tired of" paying all the bills, with the rest of the family failing to contribute, and decided to move out of the home. After Jones moved out, he stated Mother and the Victims still visited him often. According to Jones, the Victims brought these allegations as retaliation for him threatening to press charges against Older Sister for stealing money from him. On cross-examination, Jones admitted to a prior conviction for second-degree CSC stemming from an incident during his previous marriage.

At the conclusion of trial, the jury found Jones guilty of one count of first-degree CSC with a minor, one count of second-degree CSC with a minor, and two counts of lewd act upon a child. The jury, however, acquitted Jones of the five remaining indictments. Following the verdict, the circuit court sentenced Jones to life without parole for first- and second-degree CSC with a minor and fifteen years' imprisonment, to run concurrently, for each count of lewd act upon a child.[1] This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Jenkins*, 412 S.C. 643, 650, 773 S.E.2d 906, 909 (2015). "Generally, the admission of expert testimony is a matter within the sound discretion of the

---

1. Prior to trial, the State served Jones with notice of its intent to seek life without parole due to his 1985 conviction for second-degree CSC.

[circuit] court." *State v. Cope*, 405 S.C. 317, 343, 748 S.E.2d 194, 208 (2013) (quoting *State v. Whaley*, 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991)). This court will not disturb the circuit court's admissibility determinations absent a prejudicial abuse of discretion. *State v. Adkins*, 353 S.C. 312, 326, 577 S.E.2d 460, 468 (Ct. App. 2003). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *State v. Irick*, 344 S.C. 460, 464, 545 S.E.2d 282, 284 (2001). "A [circuit] court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion whe[n] the ruling is manifestly arbitrary, unreasonable, or unfair." *State v. Grubbs*, 353 S.C. 374, 379, 577 S.E.2d 493, 496 (Ct. App. 2003). To show prejudice, the appellant must demonstrate "a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof." *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).

## LAW/ANALYSIS

Jones contends the circuit court abused its discretion by allowing Galloway–Williams to testify as an expert in child sex abuse dynamics because the subject matter of her testimony was not beyond the ordinary knowledge of the jury, the State failed to prove the reliability of the substance of her testimony, she improperly bolstered the Victims' credibility, and her testimony was highly prejudicial. We disagree.

■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. The circuit court must consider the following three-prong test before allowing the jury to hear expert testimony:

First, the [circuit] court must find that the subject matter is beyond the ordinary knowledge of the jury, thus requiring an expert to explain the matter to the jury. Next, while the expert need not be a specialist in the particular branch of the field, the [circuit] court must find that the proffered expert has indeed acquired the requisite knowledge and skill to qualify as an expert in the particular subject matter.

Finally, the [circuit] court must evaluate the substance of the testimony and determine whether it is reliable.

*Watson v. Ford Motor Co.*, 389 S.C. 434, 446, 699 S.E.2d 169, 175 (2010).

■■■ "Expert testimony may be used to help the jury determine a fact in issue based on the expert's specialized knowledge, experience, or skill and is necessary in cases in which the subject matter falls outside the realm of ordinary lay knowledge." *Id.* at 445, 699 S.E.2d at 175.

Expert testimony differs from lay testimony in that an expert is permitted to state an opinion based on facts not within his firsthand knowledge or may base his opinion on information made available before the hearing so long as it is the type of information that is reasonably relied upon in the field to make opinions. On the other hand, a lay witness may only testify as to matters within his personal knowledge and may not offer opinion testimony which requires special knowledge, skill, experience, or training.

*Id.* at 445–46, 699 S.E.2d at 175.

■■■ "[B]oth expert testimony and behavioral evidence are admissible as rape trauma evidence to prove a sexual offense occurred whe[n] the probative value of such evidence outweighs its prejudicial effect." *State v. Weaverling*, 337 S.C. 460, 474, 523 S.E.2d 787, 794 (Ct. App. 1999) (alteration in original) (quoting *State v. Schumpert*, 312 S.C. 502, 506, 435 S.E.2d 859, 862 (1993)).

Expert testimony concerning common behavioral characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible. Such testimony is relevant and helpful in explaining to the jury the typical behavior patterns of adolescent victims of sexual assault. It assists the jury in understanding some of the aspects of the behavior of victims and provides insight into the abused child's often strange demeanor.

*Id.* at 474–75, 523 S.E.2d at 794.

In *State v. White*, our supreme court confirmed the admissibility of expert testimony and behavioral evidence in sexual abuse cases, holding such testimony was relevant regardless of the victim's age. 361 S.C. 407, 415, 605 S.E.2d 540, 544 (2004).

According to the court, expert testimony "may be more crucial" when the victims are children because their "inexperience and impressionability often render them unable to effectively articulate" incidents of criminal sexual abuse. *Id.* at 414–15, 605 S.E.2d at 544.

More recently, in *State v. Brown*, 411 S.C. 332, 768 S.E.2d 246 (Ct. App. 2015), *cert. denied*, (Aug. 6, 2015), this court addressed whether it was proper for an expert to testify regarding child sex abuse dynamics and stated the following:

> [T]he circuit court ... found that, based on the jurors' qualifications and their responses to questions during voir dire, the empaneled jury "would not have any prior knowledge from family members or otherwise as to sex abuse directly." At trial, Appellant cross-examined the minor victims extensively regarding their delays in disclosure as well as the varying accounts of the abuse they gave authorities. Indeed, the minor victims delayed disclosing the abuse for almost three years, were unable to recall specific days or dates on which they were abused, gave varying accounts of certain instances of abuse, and divulged more facts each time they spoke about the abuse. Such behavior undoubtedly became a fact at issue in this case, raising questions of credibility or accuracy that might not be explained by experiences common to jurors. Accordingly, we find Galloway–Williams' specialized knowledge of the behavioral characteristics of child sex abuse victims was relevant and crucial in assisting the jury's understanding of why children might delay disclosing sexual abuse, as well as why their recollections may become clearer each time they discuss the instances of abuse.

> Numerous jurisdictions considering this issue have similarly concluded it is more appropriate for an expert to explain the behavioral traits of child sex abuse victims to a jury. We believe the unique and often perplexing behavior exhibited by child sex abuse victims does not fall within the ordinary knowledge of a juror with no prior experience—either directly or indirectly—with sexual abuse. The general behavioral characteristics of child sex abuse victims are, therefore, more appropriate for an expert qualified in the field to

explain to the jury, so long as the expert does not improperly bolster the victims' testimony.

411 S.C. at 341–42, 768 S.E.2d at 251.

■ In arguing Galloway–Williams' expert testimony regarding delayed disclosures and child sex abuse dynamics was not beyond the ordinary knowledge of the jury, Jones essentially mounts a direct challenge to this court's decision in *Brown*. We are not persuaded by his argument. Galloway–Williams' testimony on these topics was substantially similar to her testimony in *Brown*, and the record indicates the jury in this case likewise had no experience, either directly or indirectly, with sexual abuse. Therefore, we decline to depart from our holding in *Brown* on this settled question of law. *See id.* at 342, 768 S.E.2d at 251 (stating "the unique and often perplexing behavior exhibited by child sex abuse victims does not fall within the ordinary knowledge of a juror with no prior experience—either directly or indirectly—with sexual abuse" and, therefore, holding it is "more appropriate for an expert qualified in the field to explain to the jury").

■ We further find Galloway–Williams' testimony regarding the ways in which nonoffending caregivers respond to sexual abuse was outside the realm of lay knowledge such that it was more appropriate for an expert to explain to the jury. The State argues, and we agree, that "caregivers' actions seem counter-intuitive to people who have never experienced the horror of sexual abuse." In our view, without having any direct or indirect experience with the circumstances surrounding sexual abuse, a lay juror would not understand the reasons why a nonoffending caregiver may not act immediately to protect a child from sexual abuse occurring in the home. *See generally Watson*, 389 S.C. at 446, 699 S.E.2d at 175 ("Expert testimony may be used to help the jury determine a fact in issue based on the expert's specialized knowledge, experience, or skill and is necessary in cases in which the subject matter falls outside the realm of ordinary lay knowledge."); *Weaverling*, 337 S.C. at 474–75, 523 S.E.2d at 794 (stating "[e]xpert testimony concerning common behavioral characteristics of sexual assault victims and the range of responses to sexual assault encountered by experts is admissible"); *see also State v. Tierney*, 150 N.H. 339, 839 A.2d 38, 46–47 (2003) (holding a

police officer's testimony was "erroneously admitted as lay testimony" based upon the conclusion that he could not testify regarding the level of knowledge of a nonoffending adult in a child sexual assault case because such testimony "required specialized training, experience[,] and skill not within the ken of the ordinary person"). Accordingly, we hold the circuit court properly admitted Galloway–Williams' expert testimony because nonoffending caregivers' behavior in sexual abuse cases—like delayed disclosures and child sex abuse dynamics—is a subject beyond the ordinary knowledge of the jury.

■ Turning to the final prong of the *Watson* test,[2] we disagree with Jones's argument that the State failed to prove the reliability of Galloway–Williams' testimony and, more specifically, whether it was subjected to peer review. "All expert testimony must satisfy the Rule 702 criteria, and that includes the [circuit] court's gatekeeping function in ensuring the proposed expert testimony meets a reliability threshold for the jury's ultimate consideration." *White*, 382 S.C. at 270, 676 S.E.2d at 686. In *State v. Chavis*, our supreme court concluded the testimony of child abuse assessment experts is nonscientific. 412 S.C. 101, 106, 771 S.E.2d 336, 338 (2015). As the *Chavis* court noted, our courts do not follow a formulaic approach in determining the foundational requirements of qualifications and reliability of nonscientific evidence. *Id.* at 108, 771 S.E.2d at 339; *see also White*, 382 S.C. at 274, 676 S.E.2d at 688 ("The foundational reliability requirement for expert testimony does not lend itself to a one-size-fits-all approach, for the *Council* factors [3] for scientific evidence serve no useful analytical purpose when evaluating nonscientific expert testimony.").

---

2. Because Jones does not contest Galloway–Williams' qualifications as an expert, we decline to address the second prong of the *Watson* test. *See Brown*, 411 S.C. at 340 n.1, 768 S.E.2d at 250 n.1 (declining to address the second prong of *Watson* because the appellant failed to challenge the expert's qualifications).

3. *See State v. Council*, 335 S.C. 1, 19, 515 S.E.2d 508, 517 (1999) (stating that, in determining whether scientific evidence is admissible, a court should look at "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures").

Jones primarily relies upon *Chavis* to support his argument that Galloway–Williams' testimony was unreliable. We find *Chavis* distinguishable, however, because the expert found to be unreliable in that case was qualified as a forensic interviewer and testified regarding the conclusions she reached after using the RATAC method to interview the victims. In contrast, Galloway–Williams testified in general terms as to child sex abuse dynamics, focusing on delayed disclosures and the responses of nonoffending caregivers. Therefore, we must determine—based upon the record before us—whether the circuit court properly discharged its gatekeeping function in determining the admissibility of Galloway–Williams' testimony by answering the threshold question of reliability. *See generally White*, 382 S.C. at 274, 676 S.E.2d at 688 (declining to offer a "formulaic approach that will apply in the generality of cases" because our supreme court "d[id] not pretend to know the myriad of Rule 702 qualification and reliability challenges that could arise with respect to nonscientific expert evidence").

Initially, we reject Jones's argument that "Galloway–Williams could not identify or name a single publication or study" to support her testimony or explain whether any of the studies she relied upon had been peer reviewed. A review of the record reveals Galloway–Williams did, in fact, identify a publication in support of her research. The following colloquy is instructive as to this point:

Q: Let's focus on delayed disclosure as it relates to child victims. You said that this information has been peer reviewed. Can you tell me, or can you give me specific examples of studies, or studies that have looked at this evidence as reliable?

A: I don't have any here with me, but I could give you articles and studies that directly relate to delayed disclosure with the full citations. It would take me a little bit of time to gather that up. I didn't bring any of that with me. But during all of the training that I've been to, including the 160 hours of skills training and the other CEs that I have obtained those articles are on the basis of fact. Additionally, the text that I use for teaching the course on child maltreatment includes information about delayed disclosure and non-offending caregivers that reference these articles as well.

Q: What text is that?

A: The text is called *Child Maltreatment* and it is written by Stefanie Keen and I can't remember the second author. Dr. Keen is one of the professors at USC Upstate.

(emphasis added).

Galloway–Williams testified that her methods were published in articles in professional journals and trade publications, subjected to peer review, uniformly accepted and recognized within the area of child sex abuse experts and professionals, and relied upon for sexual abuse counseling and treatment. Galloway–Williams further testified that the Julie Valentine Center applies the same principles she explained in her testimony, and she has given multiple presentations on delayed disclosures and the role nonoffending caregivers play in the dynamics of child sexual abuse. Likewise, Galloway–Williams confirmed that these types of principles were being used by counselors across the United States.

In light of Galloway–Williams' testimony regarding her methods, we are unable to conclude the circuit court abused its discretion in finding Galloway–Williams' testimony reliable. *See, e.g., State v. Rinehart*, 8 Haw.App. 638, 819 P.2d 1122, 1126 (1991) (finding an expert's "testimony that her training and expertise are acceptable in the field of sexual abuse, and that the characteristics exhibited by a sexually assaulted child are acceptable to and relied upon by experts in the field" gave rise to "a reasonable inference that [the expert]'s opinions were based upon an explicable and reliable system of analysis" and, thus, the defendant's argument "that the showing was inadequate" was not sufficient to demonstrate "the lower court abused its broad discretion in admitting [the expert]'s testimony"). In our view, the court adequately performed its gatekeeping function in ensuring the foundational requirements of her expert testimony were met in this case. *See White*, 382 S.C. at 274, 676 S.E.2d at 688 (noting "[t]he foundational reliability requirement for expert testimony does not lend itself to a one-size-fits-all approach"). Therefore, we find no reversible error as to the reliability issue.

 Likewise, we reject Jones's argument that Galloway–Williams improperly bolstered Mother and the Victims'

testimonies. "[E]ven though experts are permitted to give an opinion, they may not offer an opinion regarding the credibility of others." *State v. Kromah*, 401 S.C. 340, 358, 737 S.E.2d 490, 499 (2013). "The assessment of witness credibility is within the exclusive province of the jury." *State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct. App. 2012). Consequently, "it is improper for a witness to testify as to his or her opinion about the credibility of a child victim in a sexual abuse matter." *Kromah*, 401 S.C. at 358–59, 737 S.E.2d at 500.

Jones cites several cases in support of his argument that Galloway–Williams' testimony was unnecessary and only offered to improperly bolster Mother and the Victims' testimonies. *See State v. Anderson*, 413 S.C. 212, 219, 776 S.E.2d 76, 79 (2015) (holding the circuit court committed reversible error by qualifying the State's witness "as an expert in child sex abuse assessment and in forensic interviewing" because the expert "vouched for the minor when she testified only to those characteristics which she observed in the minor"); *Kromah*, 401 S.C. at 356, 358, 737 S.E.2d at 498–99 (finding a forensic interviewer's testimony regarding a " 'compelling finding' of physical child abuse" problematic and stating experts "may not offer an opinion regarding the credibility of others"); *State v. Jennings*, 394 S.C. 473, 480, 716 S.E.2d 91, 94 (2011) ("For an expert to comment on the veracity of a child's accusations of sexual abuse is improper."); *Smith v. State*, 386 S.C. 562, 569, 689 S.E.2d 629, 633 (2010) (holding "[t]he forensic interviewer's hearsay testimony impermissibly corroborated the [v]ictim's identification of [the defendant] as the assailant, and the forensic interviewer's subsequent opinion testimony improperly bolstered the [v]ictim's credibility"); *State v. Dawkins*, 297 S.C. 386, 393–94, 377 S.E.2d 298, 302 (1989) (concluding the testimony of a psychiatrist who treated the victim was improper because the psychiatrist answered "yes" to solicitor's question regarding whether, based upon his examination and observations of the victim, he was "of the impression that [the victim's] symptoms [were] genuine"); *McKerley*, 397 S.C. at 465, 725 S.E.2d at 142 (noting the circuit court erred in admitting the forensic interviewer's testimony because it included "comments on the credibility of the victim's account of the alleged sexual assault"); *State v. Dempsey*, 340 S.C. 565, 571, 532 S.E.2d 306, 309–10 (Ct. App. 2000) (stating a therapist

"improperly vouched for the victim's credibility by answering affirmatively when asked his opinion as to whether the child's symptoms of sexual abuse were 'genuine' ").

In *Brown*, however, this court clearly "distinguished improper bolstering in cases involving experts who themselves conducted the forensic interview from cases involving independent mental health experts who addressed general behavioral characteristics." *State v. Barrett*, 416 S.C. 124, 129, 785 S.E.2d 387, 389 (Ct. App. 2016) (citing *Brown*, 411 S.C. at 343–45, 768 S.E.2d at 252–53). Unlike the experts in the cases cited by Jones, Galloway–Williams did not testify as a forensic interviewer, prepare a report for her testimony, or express an opinion or belief regarding the credibility of the Victims' allegations in this case. Importantly, Galloway–Williams never interviewed Mother or the Victims, had no knowledge of the facts of the case beyond her discussions with the solicitor's office prior to trial, and did not make any of the statements our supreme court prohibited in *Kromah*.[4] Thus, we find the cases Jones cited are factually and legally distinguishable from the instant case. In our view, *Brown* is directly on point and, therefore, we analyze Galloway–Williams' expert testimony within the confines of that decision.

 Because Galloway–Williams never commented on the credibility of Mother or the Victims, but rather offered admissible expert testimony regarding the general behavioral characteristics of child sex abuse victims and nonoffending caregivers, we find her testimony did not improperly bolster their testimonies. The fact that her testimony corroborated some of the Victims' reasons for delaying disclosure of the abuse, or Mother's failure to act when she became aware of it, does not mean Galloway–Williams' testimony improperly bolstered their accounts. *See Brown*, 411 S.C. at 345, 768 S.E.2d at 253 (stating "[t]he fact that [the expert's] testimony corroborated

---

4. *See Kromah*, 401 S.C. at 360, 737 S.E.2d at 500 (holding forensic interviewers should avoid (1) stating the child was instructed to be truthful; (2) offering a direct opinion on the "child's veracity or tendency to tell the truth"; (3) indirectly vouching for the child, "such as stating the interviewer has made a 'compelling finding' of abuse"; (4) indicating "the interviewer believes the child's allegations in the current matter"; or (5) opining "the child's behavior indicated the child was telling the truth").

some of the minor victims' reasons for delaying disclosure of the abuse does not mean her testimony improperly bolstered their accounts"); *see also Weaverling*, 337 S.C. at 474, 523 S.E.2d at 794 ("An expert may give an opinion based upon personal observations or in answer to a properly framed hypothetical question that is based on facts supported by the record." (quoting *State v. Evans*, 316 S.C. 303, 311, 450 S.E.2d 47, 52 (1994))). Galloway–Williams merely offered reasons why children might delay disclosing instances of sexual abuse, as well as why a nonoffending caregiver may have an unusual reaction upon learning of the abuse, to assist the trier of fact's understanding of the complex dynamics of sexual abuse cases. Accordingly, we find the circuit court properly admitted Galloway–Williams' expert testimony because she did not improperly bolster the Victims' testimony, or Mother's testimony, at trial.

Finally, we reject Jones's argument that Galloway–Williams' testimony was highly prejudicial and cumulative. Under Rule 403, SCRE, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." "Improper corroboration testimony that is merely cumulative to the victim's testimony, however, cannot be harmless, because it is precisely this cumulative effect which enhances the devastating impact of improper corroboration." *Jolly v. State*, 314 S.C. 17, 21, 443 S.E.2d 566, 569 (1994) (emphasis omitted). Nevertheless, "both expert testimony and behavioral evidence are admissible ... whe[n] the probative value of such evidence outweighs its prejudicial effect." *Weaverling*, 337 S.C. at 474, 523 S.E.2d at 794 (quoting *Schumpert*, 312 S.C. at 506, 435 S.E.2d at 862).

Based upon our review of the record, we find Galloway–Williams' testimony was not cumulative because she did not restate or improperly corroborate Mother or the Victims' testimonies. Moreover, we find the high probative value of her testimony outweighed any prejudicial effect on Jones's case. *See* Rule 403, SCRE. As in *Brown*, "Galloway–Williams' testimony was relevant to help the jury understand various aspects of victims' behavior and provided insight into the often strange demeanors of sexually abused children." 411 S.C. at 347, 768 S.E.2d at 254; *see also Weaverling*, 337 S.C. at 474, 523 S.E.2d

at 794 (noting expert testimony "assists the jury in understanding some of the aspects of the behavior of victims and provides insight into the abused child's often strange demeanor"). Her "testimony was also crucial in explaining to the jury why child sex abuse victims are often unable to effectively relay incidents of criminal sexual abuse." *Brown*, 411 S.C. at 347, 768 S.E.2d at 254; *see also White*, 361 S.C. at 414–15, 605 S.E.2d at 544 (noting "[t]he inexperience and impressionability of children often render them unable to effectively articulate the events giving rise to criminal sexual behavior"). Further, her testimony assisted in explaining the various reactions a nonoffending caregiver may have when learning about sexual abuse occurring in the home.

As noted above, Galloway–Williams did not repeat Mother or the Victims' allegations, vouch for their credibility, or make any statements that improperly corroborated their testimonies. Further, she was not qualified as an expert in forensic interviewing. Thus, as this court stated in *Brown*,

the concerns our supreme court expressed in *Kromah* regarding forensic interviewers testifying as experts in child sexual abuse cases are inapplicable to the instant case because the danger of prejudice—which could result from the jury giving undue weight to the expert testimony of a forensic interviewer who interviews the victim and expresses an opinion as to the child's credibility—is simply not present here.

411 S.C. at 348, 768 S.E.2d at 254. Accordingly, we find the circuit court properly admitted Galloway–Williams' expert testimony because her testimony did not improperly corroborate Mother or the Victims' testimony, was not cumulative, and its probative value substantially outweighed any prejudice Jones experienced from its submission to the jury.

## CONCLUSION

Based on the foregoing analysis, the circuit court's judgment is

**AFFIRMED.**[5]

LOCKEMY, C.J., and MCDONALD, J., concur.

---

5. We decide this case without oral argument pursuant to Rule 215, SCACR.