# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Marcus Alexander Wigfall, Appellant.

Appellate Case No. 2023-000236

―――――――――

Appeal From Charleston County
Jennifer B. McCoy, Circuit Court Judge

―――――――――

Opinion No. 6140
Heard April 8, 2025 – Filed March 11, 2026

―――――――――

## REVERSED

―――――――――

Appellate Defender Joanna Katherine Delany, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Andrew Douglas Powell, both of
Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston, all for Respondent.

―――――――――

**KONDUROS, J.:** Marcus Alexander Wigfall appeals his convictions and
sentences for third-degree criminal sexual conduct (CSC) with a minor and
contributing to the delinquency of a minor. He argues the trial court erred by
admitting testimonies that improperly bolstered the minor victim's credibility. He
contends a forensic interviewer's testimony that after interviewing the victim, the
interviewer recommended the case be staffed with law enforcement improperly
bolstered the victim's credibility. He also maintains the interviewer's testimony the

victim received a mental-health assessment and the victim's testimony that she received counseling after she disclosed he abused her also improperly bolstered the victim's credibility.  We reverse.

## FACTS/PROCEDURAL HISTORY

In 2015, Wigfall began living with his girlfriend (Mother), her daughter (Minor 1), and Minor 1's twin brother (Minor 2).  On June 8, 2020, Minor 1, who was almost seventeen years old at the time, told Mother that Wigfall had been sexually abusing her for three years.  Mother contacted law enforcement the next day.  On the morning of June 11, 2020, Detective Nikolas Perez, who at the time was a patrol officer with the City of Charleston Police Department, responded to a report of sexual assault of a juvenile that had occurred in the past.  Detective Perez interviewed Mother and Minor 1 separately.  Minor 1 told Detective Perez the abuse had occurred two times a week for three years.  As a result, Charleston Police Department detectives started an investigation and subsequently arrested Wigfall.

A grand jury indicted Wigfall of third-degree CSC with a minor, two counts of second-degree CSC with a minor, and contributing to the delinquency of a minor.  A trial was held from February 6 through 8, 2023.

At trial, Minor 1[1] testified about Wigfall's abuse.  She described Wigfall asking her while they were in the kitchen, if Minor 1 "would give oral or let [Mother] die."  Minor 1 stated she repeatedly responded she would let Mother die but Wigfall kept asking her the question to try to get her to change her answer.  Minor 1 testified that once she changed her answer to state "[she]'d give oral," Wigfall led her down the hall to Mother's bedroom.  Minor 1 stated Wigfall took her hand and placed it over his penis on top of his clothing.  She indicated she removed her hand and left the room.  She provided Wigfall followed her, asking what was wrong and she told him that she did not want to do that.

Minor 1 testified the next incident occurred when she "was in trouble about something" after school one day and Wigfall told her to choose between "seven minutes in heaven or get a whooping."  Minor 1 stated she chose to "get a whooping" but Wigfall again attempted to get her to change her answer, so she eventually said "seven minutes in heaven."  She indicated that in response, Wigfall got a gas mask with a bong and had Minor 1 smoke marijuana out of it.  Minor 1

---

[1] At the time of trial, February 2023, Minor 1 was nineteen years old.

provided that Wigfall then helped her take off her clothing, but "just her bottoms." Minor 1 stated Wigfall "performed oral on [her]," putting "[h]is mouth . . . on [her] vagina." Minor 1 provided that after a few minutes, she pushed Wigfall off of her and left the house. Minor 1 described how on other occasions, Wigfall "tried to penetrate [her]." Minor 1 testified that most of the incidents occurred in Mother's bedroom, which Mother shared with Wigfall. Minor 1 provided that occasionally, her Mother would return home from work and find Minor 1 in Mother's bedroom. Minor 1 explained she was not allowed to be in Mother's bedroom.

Minor 1 testified that to get her to join him in Mother's bedroom, Wigfall would either call out for her to come to the room or send her a text message stating, "Come here." The State introduced screenshots of text messages between Minor 1 and Wigfall. Minor 1 testified Wigfall sent her the message "come here" on April 23 at 4:51 p.m., the year she disclosed the abuse to Mother. Seven minutes later, Wigfall sent the text message ". . . .", which Minor 1 testified meant "[w]aiting for a response." The screenshot of the text messages showed no response from Minor 1 that day, and Minor 1 testified she ignored him. Wigfall sent another message on June 6, shortly before Minor 1 disclosed the abuse, stating, "Just [k]no[w] i aint [sic] never told [yo]u no w[h]en [yo]u always wanted s[o]m[e]thin[g] ijs."[2] Minor 1 stated this message "was referring to when [she] told [Wigfall] no, which was the last time anything else" happened.

Minor 1 indicated the abuse occurred two to three times every couple of weeks, when Mother was at her second job in the evening and Minor 1, Minor 2, and Wigfall were at home after school.

Minor 1 testified she had told her friend, Ivy Grinnage, about the abuse prior to telling Mother. Minor also testified that in addition to Mother and Grinnage, she had discussed the abuse with a police officer and answered yes when asked if she was "interviewed also by a lady." Minor 1 provided she had never disclosed the abuse to Minor 2. The State asked Minor 1 if after she told Mother about the abuse, did she "go to some counseling?" Wigfall objected, stating "bolstering." The trial court overruled the objection. Minor 1 then answered, "Yes."

On cross-examination, Minor provided she never touched Wigfall's penis again after the first incident. She testified Wigfall attempted to penetrate her on multiple occasions but he was never successful because it hurt her too much and she was "closed" because she was "a virgin." She also provided that in 2019, Mother had

---

[2] According to Minor 1, "ijs" meant "I'm just saying."

asked her if "anybody tried anything with you?" and Minor 1 told Mother no, despite the fact that Wigfall was abusing her at the time. On redirect, Minor explained that by penetration, she meant "[a]ctually going inside" "[her] vagina."

Minor 2 testified that when he was at home, he spent most of the time in his room and when he was in his room, the door was normally closed. He indicated he had never seen "anything inappropriate between Minor 1 and . . . Wigfall." He testified that some evenings, he was not at home because he was at work or at practice for a sports team. On cross-examination, he was asked about when he started those activities and answered he did not have a job when he was thirteen and was not sure if he did when he was fourteen. He provided he was in either ninth or tenth grade when he began working at his first job. He also stated he started wrestling his ninth-grade year and going to football practice when he was sixteen. He testified that before he got a job and started sports, he typically would be at home playing video games in the living room with Wigfall and others after school and in the evening.

Grinnage testified she and Minor 1 were friends during high school. Grinnage stated that in the fall or winter of 2019, during a telephone conversation, Minor 1 told her she was being "sexually assaulted" in her home. Grinnage provided that Minor 1 told her "[i]t had been happening for a while." Grinnage stated that on one occasion when she was talking to Minor 1 on the telephone after that, Grinnage heard a male "voice in the background call her." Grinnage described that Minor 1's "entire mood changed" and she told Grinnage she "gotta go" and ended the call.

Mother testified that on some occasions, she arrived home from work and found Minor 1 in Mother's bedroom sitting on the floor and Wigfall "in the bed." Mother provided that Minor 1 was "not allowed" in Mother's bedroom when Mother was not home. Mother stated that Wigfall had once asked Mother what she would do if Minor 1 became pregnant and Mother responded with confusion because she felt she did not need to "worry about" that because Minor 1 was a lesbian. Mother provided she asked Wigfall if he was "planning on getting [Minor 1] pregnant" and he responded no.

Mother indicated that after Minor 1 told her about the abuse, Mother asked Wigfall about it and he denied it. Mother testified that the night Minor 1 told her about the abuse, Wigfall stayed that night at the home in Mother's room because he could not get in touch with his mother, but the following morning Mother told him to take his belongings and not return to the home. Mother testified she continued to have

a relationship with Wigfall for about two years after that despite them no longer living together because she "gave him the benefit of the doubt." She provided that he did not see Minor 1 after he moved out of Mother's home.

On cross-examination, Mother testified that Minor 2 was often home with Minor 1 and Wigfall and normally had his bedroom door open. Mother testified Minor 2 began working after school when he was about sixteen years old and started playing football and participating in wrestling in eleventh grade. Mother provided Minor 1 disclosed the abuse during Minor 1 and Minor 2's eleventh-grade year. Mother also testified that Minor 2 spent a lot of time playing video games, sometimes with Wigfall.

Mother responded yes on cross-examination, when asked if Minor 1 briefly went to counseling. Mother was asked if she had raised concerns about Minor 1 lying, and Mother responded that her references to Minor 1 lying had been about "simple stuff" like household tasks.

Detective Perez testified he interviewed Minor 1 when he responded to the report of sexual abuse and she told him the abuse had occurred two times a week for three years.

Alix Desch testified she worked at the Dee Norton Child Advocacy Center (the Center) and had worked there for seven years. She provided she had an undergraduate degree in psychology and a master of social work degree. She explained that part of her job was aiding law enforcement in interviewing victims and it was "a policy that law enforcement needed to help in their investigation." She indicated she had met with Minor 1 in this capacity. Desch stated she interviewed Minor 1 on two separate occasions in June of 2020. She provided that at Minor 1's first interview session, "we . . . took a lot of time in that interview" and a medical exam was scheduled for that same day. Desch stated Mother accompanied Minor 1 to the interview but family members could not be present during the interview. Desch testified the interview was one-on-one between herself and the child and "law-enforcement partners" could " live observe through closed-caption television." Desch confirmed the interview was audio and video recorded. Desch was asked if she was aware of a rule allowing that interview to be played in court.[3] Wigfall objected to that question, and the trial court sustained the

[3] "Section 17-23-175 [of the South Carolina Code (2014)] sets forth the criteria for admitting out-of-court statements of children *under the age of twelve*, including those captured on video." *State v. Clark*, 444 S.C. 606, 612, 910 S.E.2d 481, 484

objection.  The recording of the interview was not referenced again during Desch's testimony.

The State asked Desch if Minor 1 told her about being sexually assaulted and Wigfall objected stating, "I think this is cumulative . . . based on the bolstering of the other witnesses and everything."  The trial court overruled the objection, and Desch answered the question, stating "[y]es."  The State asked if Minor 1 had told Desch where the abuse occurred, and Desch responded yes and that Minor 1 told her it happened in Minor 1's bedroom and also Mother's bedroom.  The State also asked if Minor 1 had told Desch when the abuse happened, and Desch responded that Minor 1 had given a time frame starting in seventh or eighth grade, when she was "about [thirteen] years old, and that it had gone on multiple times since then."  The State asked if Desch made any referrals for Minor 1, and Wigfall objected, stating "vouching."  The trial court overruled the objection.  Desch answered:

> [W]e [] make [a] standard recommendation for every child that comes to [the C]enter to have their case staffed with our multidisciplinary team so that we can all convene and discuss with the investigators what's going on, as well as referring for a mental-health assessment to see if any ongoing support or treatment is needed after an initial consult.

The State asked if that was "pretty standard?" and Desch responded yes.  The State then asked if Desch knew if Minor 1 "followed through with that referral?"  Desch began answering, stating she did not have the records in front of her but that she had "been informed that she did follow up --."  Wigfall objected, the trial court sustained the objection, and the State did not ask Desch any more questions.

Detective Michael Christophersen testified he worked in the special victims unit of the City of Charleston Police Department in June 2020.  He testified that when he

---

(2024) (emphasis added).  "[T]he admission of the videotape [of an investigative interview of a child] would likely be error in absence of the statute." *State v. Russell*, 383 S.C. 447, 450, 679 S.E.2d 542, 543 (Ct. App. 2009); *see also State v. Whitner*, 399 S.C. 547, 558, 732 S.E.2d 861, 867 (2012) ("Generally, a prior consistent statement is not admissible unless the witness is charged with fabrication or improper motive or bias.  However, in CSC cases involving minors, the Legislature has made specific allowances for such hearsay statements of child victims under the proper circumstances." (citation omitted)).

was assigned this case, he referred the case to the Center for Minor 1 to be interviewed. He testified it was common and considered the best practice to refer possible victims to the Center to conduct those interviews. Detective Christophersen testified he observed Desch's interviews with Minor 1 via live feed in a separate room. He testified he spoke with Minor 1 after her second interview to review the text messages sent between her and Wigfall.

Stephanie Petersen testified she was a family nurse practitioner and worked at the Medical University of South Carolina. She was qualified as an expert witness in the area of pediatric SANE exams. She provided SANE stood for "[s]exual assault nurse examiner." She stated she examined Minor 1 at the Center after the Department of Social Services had referred Minor 1. She testified part of the examination included a genital exam, in which she looked "at the area comprised of the reproductive organs." Petersen indicated the exam findings were normal. She explained "[t]he majority of children who experience sexual abuse have normal exams" because any injury can heal quickly because of the type of tissue that makes up that area and that area of the body is "meant to stretch, so . . . there can be penetrative trauma without visible injury or scarring."

The trial court qualified Dr. Carole Swiecicki as an expert witness "in the field of child-sexual-abuse dynamics."[4] Dr. Swiecicki indicated she had never "met any family members involved in this case" and did not know the age or gender of any potential victim in the case. Dr. Swiecicki testified regarding the phenomena of

---

[4] Prior to Petersen's testimony, Wigfall made a general objection to the testimony of the child abuse expert witness, "the blind witness," on the ground of indirectly vouching and bolstering Minor 1's testimony. Following Petersen's testimony, the State called Dr. Swiecicki to testify, and Wigfall renewed his earlier objection. Before Dr. Swiecicki's testimony began, the trial court had a short discussion on the record but out of the jury's hearing confirming Dr. Swiecicki had not treated Minor 1 and then when the jury could hear, stated, "Your objection is renewed timely. I'll allow this witness to testify." *See State v. Garland*, 437 S.C. 126, 133, 876 S.E.2d 338, 342 (Ct. App. 2022) ("While our supreme court has recognized an expertise in child abuse assessment, it has cautioned that 'allow[ing] the person who examined the child to testify to the characteristics of victims runs the risk that the expert will vouch for the alleged victim's credibility.' The better practice 'is not to have the individual who examined the alleged victim testify, but rather to call an independent expert.'" (alteration in original) (first quoting *State v. Anderson*, 413 S.C. 212, 218-19, 776 S.E.2d 76, 79 (2015); and then quoting *id*. at 218, 776 S.E.2d at 79)).

"delayed disclosure" and also possible behavioral, emotional, or physical health symptoms a child victim of sexual abuse could experience.

The State rested. Wigfall did not testify or present any witness testimony.

During closing arguments, the State stated:

> The main evidence that you have and the direct evidence that you have is Minor 1's statement. When you're judging the credibility of a witness, one of the things that you can look at is the details that she was able to provide you about what happened. And she was able to provide you some detail.

The State referenced Desch's testimony once, stating: "You heard from Alix Desch, the interviewer at the . . . [C]enter, that Minor 1 did make a disclosure to her." This is the only reference to Desch in the State's closing arguments.

Wigfall's closing argument attacked Minor 1's testimony and credibility directly and also provided the ways in which he argued the evidence did not support Minor 1's accusations.

The jury deliberated for almost six hours and during deliberations asked to be recharged once on all of the indicted offenses and later on only the third-degree CSC with a minor charge. The jury ultimately convicted Wigfall of third-degree CSC with a minor and contributing to the delinquency of a minor. It acquitted him of two counts of second-degree CSC with a minor. For the third-degree CSC with a minor conviction, the trial court sentenced him to fifteen years' imprisonment, suspended upon the service of twelve years' imprisonment and five years of probation, with credit for time served. For the conviction of contributing to the delinquency of a minor, the trial court sentenced him to a concurrent three-year term of imprisonment. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Washington*, 379 S.C. 120, 123, 665 S.E.2d 602, 604 (2008). "Appellate courts are bound by the trial court's factual findings unless they are clearly erroneous." *State v. Porter*, 389 S.C. 27, 34-35, 698 S.E.2d 237, 241 (Ct. App. 2010). "A ruling on the admissibility of evidence is within the sound discretion of the trial court and

will not be reversed absent an abuse of discretion." *Washington*, 379 S.C. at 123-24, 665 S.E.2d at 604. "An abuse of discretion occurs when the conclusions of the [trial] court are either controlled by an error of law or are based on unsupported factual conclusions." *State v. Garland*, 437 S.C. 126, 130, 876 S.E.2d 338, 340 (Ct. App. 2022) (quoting *State v. Chavis*, 412 S.C. 101, 106, 771 S.E.2d 336, 338 (2015)).

## LAW/ANALYSIS

### I. Desch's Testimony about Law Enforcement Investigators

Wigfall argues the trial court erred by admitting Desch's testimony that upon interviewing Minor 1 about the alleged abuse, Desch recommended the case be staffed with law enforcement. He contends this testimony was inadmissible because it vouched for or improperly bolstered Minor 1's credibility, conveying to the jury that Minor 1 was credible. We agree.

"The assessment of witness credibility is within the exclusive province of the jury." *State v. Makins* (*Makins I*), 433 S.C. 494, 501, 860 S.E.2d 666, 670 (2021) (quoting *State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct. App. 2012)). "[I]t is improper for a witness to testify as to his or her opinion about the credibility of a child victim in a sexual abuse matter." *Id.* (quoting *State v. Kromah*, 401 S.C. 340, 358-59, 737 S.E.2d 490, 500 (2013)). "A witness may not give an opinion for the purpose of conveying to the jury—directly or indirectly—that she believes the victim." *Id.* (quoting *Briggs v. State*, 421 S.C. 316, 324, 806 S.E.2d 713, 717 (2017)).

"[A] witness 'may not . . . give testimony that improperly bolsters the credibility of the victim.'" *Chappell v. State*, 429 S.C. 68, 75, 837 S.E.2d 496, 499 (Ct. App. 2019) (omission in original) (quoting *Briggs*, 421 S.C. at 323, 806 S.E.2d at 717). "Improper bolstering is 'testimony that indicates the witness believes the victim, but does not serve some other valid purpose.'" *Id.* at 75, 837 S.E.2d at 499-500 (quoting *Briggs*, 421 S.C. at 325, 806 S.E.2d at 718). "Improper bolstering also occurs when a witness testifies for the purpose of informing the jury that the witness believes the victim, or when there is no other way to interpret the testimony other than to mean the witness believes the victim is telling the truth." *Id.* at 75, 837 S.E.2d at 500. "However, an expert's testimony is not improper bolstering 'when the expert witness gives no indication about the victim's veracity . . . .'" *Id.* (omission in original) (quoting *State v. Perry*, 420 S.C. 643, 663, 803

S.E.2d 899, 910 (Ct. App. 2017), *rev'd on other grounds*, 430 S.C. 24, 842 S.E.2d 654 (2020)).

"The primary method of providing corroborating testimony regarding an alleged sexual assault is through the specific [evidentiary] rule created for CSC cases—Rule 801(d)(1)(D), SCRE." *State v. Simmons*, 423 S.C. 552, 563, 816 S.E.2d 566, 572 (2018). "This rule 'limits corroborating testimony . . . to the time and place of the assault(s)' and considers it to be nonhearsay whereas 'any other details or particulars, including the perpetrator's identity,' are generally considered hearsay and must be excluded unless they fall within an exception." *Id.* (omission in original) (quoting *Thompson v. State*, 423 S.C. 235, 241, 814 S.E.2d 487, 490 (2018)). Additionally, "in CSC cases involving minors, the Legislature has made specific allowances for such hearsay statements of child victims under the proper circumstances." *State v. Whitner*, 399 S.C. 547, 558, 732 S.E.2d 861, 867 (2012). "Section 17-23-175 [of the South Carolina Code (2014)] sets forth the criteria for admitting out-of-court statements of *children under the age of twelve*, including those captured on video." *State v. Clark*, 444 S.C. 606, 612, 910 S.E.2d 481, 484 (2024) (emphasis added).

"[A] forensic interviewer is a person specially trained to talk to children when there is a suspicion of abuse or neglect." *Kromah*, 401 S.C. at 357, 737 S.E.2d at 499 (alteration in original) (quoting *In re K.K.C.*, 728 N.W.2d 225, 2006 WL 3803037, at *2 (Iowa Ct. App. 2006) (unpublished table decision)). "[A] forensic interviewer may serve dual purposes in child sex abuse cases." *Briggs*, 421 S.C. at 327, 806 S.E.2d at 719. "First, [the interviewer] serve[s] an evidentiary purpose." *Id.* "In this regard, . . . '[t]he sole purpose of [the interviewer's] jury testimony is to lay the foundation for the introduction of the videotape, and the questioning must be limited to that subject.'" *Id.* (quoting *State v. Anderson*, 413 S.C. 212, 220-21, 776 S.E.2d 76, 80 (2015)). "Thus, the evidentiary purpose of a forensic interviewer is to use her skills in interviewing a child to enable the child to speak, so the jury—not the forensic interviewer—may determine 'if something happened.'" *Id.* at 327-28, 806 S.E.2d at 719. "The job of the interviewer is not to provide therapy, but to collect facts." *Kromah*, 401 S.C. at 357, 737 S.E.2d at 499. "It has been said that a forensic interviewer's purpose is to prepare for trial." *Id.*

Additionally, "[f]orensic interviewers might be useful as a tool to aid law enforcement officers in their initial investigative process." *Briggs*, 421 S.C. at 328, 806 S.E.2d at 719 (quoting *Kromah*, 401 S.C. at 357 n.5, 737 S.E.2d at 499 n.5). "[O]ne 'purpose of [a forensic] interview is to allow law enforcement to determine whether a criminal investigation is warranted.'" *Id.* (second alteration in original)

(quoting *Anderson*, 413 S.C. at 221, 776 S.E.2d at 80). In that capacity, "forensic interviewers serve an investigatory purpose." *Id.* However, "this investigatory purpose should *not* be discussed in the forensic interviewer's testimony before the jury." *Id.* (emphasis added). "There is to be no testimony . . . that the purpose of the interview is to allow law enforcement to determine whether a criminal investigation is warranted." *Anderson*, 413 S.C. at 221, 776 S.E.2d at 80. "This type of testimony . . . necessarily conveys to the jury that the interviewer and law enforcement believe the victim and that their beliefs led to the defendant's arrest, these charges, and this trial, thus impermissibly bolstering the minor's credibility." *Id.*

"[T]he primary purpose for calling a 'forensic interviewer' as a witness is to lend credibility to the victim's allegations." *Kromah*, 401 S.C. at 358, 737 S.E.2d at 499. However, a witness testifying "as to his or her opinion about the credibility of a child victim in a sexual abuse matter" would be "improper." *Id.* at 359, 737 S.E.2d at 500. Our supreme court has found when the only purpose of certain testimony by a forensic interviewer was to bolster the victim's credibility, that testimony was improper. *Briggs*, 421 S.C. at 329, 806 S.E.2d at 720.

In light of these considerations, our supreme court has "specified the appropriate scope of testimony for forensic interviewers." *Clark*, 444 S.C. at 613, 910 S.E.2d at 485. The supreme court has provided that a forensic interviewer's testimony may properly include (1) "the time, date, and circumstances of the interview;" (2) "any personal observations regarding the child's behavior or demeanor;" and (3) "a statement as to events that occurred within the personal knowledge of the interviewer." *Kromah*, 401 S.C. at 360, 737 S.E.2d at 500. "[L]ike any other fact witness, the forensic interviewer may testify to her observations. This fact-based testimony can include . . . the 'particulars of their examinations[] and their personal observations.'" *Anderson*, 413 S.C. at 221 n.6, 776 S.E.2d at 80 n.6. Specific examples "of statements a forensic interviewer should avoid at trial" include (1) "the child was told to be truthful;" (2) "a direct opinion as to a child's veracity or tendency to tell the truth;" (3) "any statement that indirectly vouches for the child's believability, such as stating the interviewer has made a 'compelling finding' of abuse;" (4) "any statement to indicate to a jury that the interviewer believes the child's allegations in the current matter;" and (5) "an opinion that the child's behavior indicated the child was telling the truth." *Kromah*, 401 S.C. at 360, 737 S.E.2d at 500.

In *Briggs*, our supreme court stated that a forensic interviewer "informing the jury she conducted the forensic interviews for the purpose of finding out whether the

sexual abuse happened . . . went far beyond her role as a person who collects facts for the jury to use in the jury's determination of whether the victim was telling the truth." 421 S.C. at 328, 806 S.E.2d at 720. The supreme court explained that a forensic interviewer's testimony "she made the determination the child understood the difference between a truth and a lie before she conducted the interviews [wa]s not part of her evidentiary role." *Id.* at 329, 806 S.E.2d at 720. The court provided the "testimony not only revealed to the jury that she believed the child knew the difference, but she also indirectly revealed she believed the subsequent disclosure in the interview was the truth." *Id.* Accordingly, the court determined the testimony was improper as its only purpose was to bolster the victim's credibility. *Id.*

Wigfall asserts Desch's testimony she "referred the case to a multidisciplinary team to meet with law enforcement investigators"[5] was improper bolstering. Although Desch was answering the question of if she made any referrals for Minor 1, her actual answer provided that at the Center, "we [] make [a] standard recommendation for every child that comes to [the C]enter to" staff the case and discuss with investigators. She answered that the Center does this "for every child"—which would include Minor 1. However, this testimony references the investigatory purpose our supreme court has explained should not be mentioned to the jury—the forensic interviewer's purpose to allow law enforcement to decide whether to conduct a criminal investigation. *See Anderson*, 413 S.C. at 221, 776 S.E.2d at 80 (providing the forensic interviewer's jury testimony should not discuss the interview's purpose of allowing "law enforcement to determine whether a criminal investigation is warranted"); *id.* ("This type of testimony . . . necessarily conveys to the jury that the interviewer and law enforcement believe the victim and that their beliefs led to the defendant's arrest, these charges, and this trial, thus impermissibly bolstering the minor's credibility."); *see also Briggs*, 421 S.C. at 328, 806 S.E.2d at 719 ("In both *Kromah* and *Anderson*, . . . we specifically held

---

[5] Desch testified "we [] make [a] standard recommendation for every child that comes to [the C]enter to have their case staffed with our multidisciplinary team so that we can all convene and discuss with the investigators what's going on." She did not include the term "law enforcement" immediately before the word "investigators." However, her testimony prior to that statement had referred to aiding law enforcement in its investigation by interviewing the victims and "law-enforcement partners" watching the interviews through a television monitor while they were occurring. Thus, the implication is that "investigators" refers to law enforcement.

that this investigatory purpose should not be discussed in the forensic interviewer's testimony before the jury.").

In this case, the video recording of Desch's interview of Minor 1 was not admissible because Minor 1 was sixteen years old at the time Desch interviewed her. *See Clark*, 444 S.C. at 612, 910 S.E.2d at 484 ("Section 17-23-175 sets forth the criteria for admitting out-of-court statements of *children under the age of twelve*, including those captured on video." (emphasis added)); *State v. Russell*, 383 S.C. 447, 450, 679 S.E.2d 542, 543 (Ct. App. 2009) ("[T]he admission of the videotape [of a forensic interview] would likely be error in absence of the statute."). Our supreme court has stated that the only purpose of a forensic interviewer's testimony is to lay the foundation for the introduction of a video-recorded interview of a minor victim by the forensic interviewer. *See Anderson*, 413 S.C. at 220-21, 776 S.E.2d at 80 ("The sole purpose of [a forensic interviewer's] jury testimony is to lay the foundation for the introduction of the videotape, and the questioning must be limited to that subject."). Wigfall contends the State did not present Desch's testimony for a legitimate purpose. Because no video recording of the forensic interview could have been properly admitted because of the alleged victim's age, the purpose of Desch's testimony could not have been to lay the foundation for such a video.

Desch's statement about law enforcement was bolstering because the testimony had no allowable purpose before the jury, particularly when she was not introducing the video recording of the interview. *See Kromah*, 401 S.C. at 358, 737 S.E.2d at 499 ("It is undeniable that the primary purpose for calling a 'forensic interviewer' as a witness is to lend credibility to the victim's allegations."); *Chappell*, 429 S.C. at 75, 837 S.E.2d at 499-500 ("Improper bolstering is 'testimony that indicates the witness believes the victim, but does not serve some other valid purpose.'" (quoting *Briggs*, 421 S.C. at 325, 806 S.E.2d at 718)); *id.* at 77, 837 S.E.2d at 501 ("[T]he testimony of any witness[] is improper bolstering if . . . the sole purpose of the testimony is to convey the witness's opinion about the victim's credibility . . . ."). Accordingly, we hold the trial court erred in allowing Desch to testify about law enforcement involvement. We address whether this error was harmless later in the opinion.

## II. Minor 1's and Desch's Testimonies about Counseling and Mental-Health Assessment

Wigfall argues the trial court erred by admitting Minor 1's testimony that she received counseling after she disclosed the alleged abuse. Wigfall also contends

the trial court erred by admitting Desch's testimony that Minor 1 received a mental-health assessment. He maintains these testimonies vouched for or improperly bolstered Minor 1's credibility and thus were inadmissible because the testimonies conveyed to the jury that Minor 1 was credible. We disagree.

In *Makins*, a minor victim's therapist "testified about the symptoms child victims of sexual abuse may exhibit." *State v. Makins* (*Makins II*), 428 S.C. 440, 446, 835 S.E.2d 532, 536 (Ct. App. 2019), *rev'd*, 433 S.C. 494, 860 S.E.2d 666. The therapist next testified that she treated the victim. *Id.* at 447, 835 S.E.2d at 536. This court determined the trial court erred in allowing the therapist's testimony because it improperly bolstered the victim's testimony. *Id.* at 444, 835 S.E.2d at 534. This court held the therapist's "opinion testimony addressing the various manifestations of child sexual abuse, followed immediately by her affirmative response that she treated Victim, implied she believed Victim was telling the truth with respect to her allegations of sexual abuse." *Id.* at 448-49, 835 S.E.2d at 537. This court explained, "If [the therapist] believed Victim had not been telling the truth, [the therapist] would not have needed to treat her. As the [trial] court warned, [the therapist's] testimony implied she was treating Victim for sexual trauma because Victim had suffered such trauma." *Id.* at 449, 835 S.E.2d at 537.

However, our supreme court reversed this court's decision, determining testimony from the therapist that she provided therapy to the minor victim was not bolstering. *Makins I*, 433 S.C. at 503, 860 S.E.2d at 671. The supreme court stated whether the "testimony constituted improper bolstering is a close question." *Id.* The therapist's testimony "confirm[ed] she treated Minor, [but] she was not allowed to explain why she was treating Minor, detail her treatment of Minor, or testify as to her diagnosis of Minor. [The therapist] only addressed the circumstances of Minor's disclosure of abuse and the drawing Minor produced in therapy." *Id.* The supreme court provided that this court had "referenced the timing and manner in which [the therapist] affirmed she treated Minor, noting [the therapist's] opinion testimony on the 'various manifestations of child sexual abuse' was 'followed immediately' by her response that she treated Minor, therefore implying [the therapist] believed Minor's allegations." *Id.* (quoting *Makins II*, 428 S.C. at 448-49, 835 S.E.2d at 537). The supreme court explained, "While we do not reject outright the notion that circumstances, such as timing and manner, could possibly contribute to improper bolstering, this [c]ourt has typically focused on the content of the expert's testimony." *Id.* The supreme court stated, "To suggest [the therapist's] simple affirmation that she provided therapy to Minor can singularly constitute improper bolstering is a bridge too far. In this specific context, [the therapist's] 'yes' alone, without more, did not convey to the jury that [the therapist]

believed Minor." *Id.* The supreme court noted this court had concluded that "[i]f [the therapist] believed [Minor] had not been telling the truth, [the therapist] would not have needed to treat her" and excluded the testimony on this basis. *Id.* at 504, 860 S.E.2d at 672 (first and third alterations in original) (quoting *Makins II*, 428 S.C. at 449, 835 S.E.2d at 537). However, the supreme court explained this court's decision would go beyond the warning "against having one expert testify as a general characteristics expert and as a treating expert." *Id.* The supreme court opined to enact such a "rule would mean the testimony of a child's treating therapist—even when there was a blind characteristics expert—always indirectly and improperly bolsters the child's credibility. In practical terms, the court of appeals' ruling would require the exclusion of treating experts' testimony in general . . . ." *Id.*

The supreme court determined the therapist's "testimony served valid evidentiary purposes. [Her] testimony as Minor's treating therapist was required to lay the foundation for introducing Minor's graphic drawing into evidence. Minor's drawing and her disclosure to [the therapist] were the basis of the most serious charge against [the defendant]—first-degree CSC with a minor." *Id.* at 504-05, 860 S.E.2d at 672. The court concluded the therapist's "testimony served a purpose other than to vouch for Minor's credibility." *Id.* at 505, 860 S.E.2d at 672. The supreme court distinguished the facts in that case from some prior cases "because [the therapist's] alleged improper bolstering was not direct" in *Makins*. *Id.* at 502, 860 S.E.2d at 671. It further distinguished it from other prior cases because the therapist's "simple affirmation that she provided therapy to Minor also differs from previous indirect vouching cases in which expert witness testimony was more extensive." *Id.*

In *State v. Eubanks*, this court determined "the [trial] court acted within its discretion in finding [a treating therapist's] testimony did not improperly vouch for Child's credibility." 437 S.C. 458, 474, 878 S.E.2d 335, 344 (Ct. App. 2022). This court noted that "[a]lthough [the therapist] testified she provided Child with trauma focused cognitive behavioral therapy, she specifically noted a trauma narrative is 'not investigative at all. It's purely therapeutic and it's just to help them move on with their life to get past the trauma.'" *Id.* The court provided that "[e]ven though [the therapist] testified she provides therapy for children who have been abused, she made no statements regarding whether Child's trauma was the result of abuse nor did she reference sexual abuse or the specific characteristics and behaviors of sexual abuse victims." *Id.* Additionally, this court held a psychiatrist's testimony did not constitute improper vouching. *Id.* That "testimony did not reference sexual abuse"; instead, the psychiatrist "testified she diagnosed Child with [post-traumatic

stress disorder (PTSD)] based on her one-hour session with Child and her review of [the therapist's] notes." *Id.* The psychiatrist "explained PTSD was the result of a 'significant traumatic event' and not simply stress in an individual's life. However, she did not testify as to any specific traumatic event as precipitating Child's PTSD." *Id.*

Wigfall argues Desch's testimony was bolstering because she mentioned Minor 1 received a mental-health assessment. While Desch was answering the question of if she made any referrals for Minor 1, her actual answer provided that at the Center "we [] make [a] standard recommendation for every child that comes" there to refer the child "for a mental-health assessment to see if any ongoing support or treatment is needed after an initial consult." Desch confirmed that this process was "pretty standard" and did not answer specifically as to what happened in Minor 1's case. The State asked if Minor 1 followed through with the referral and Desch began answering, stating she did not have the records in front of her but that she had "been informed that she did follow up - -" at which time, Wigfall objected and the trial court sustained the objection but no motion was made to strike what Desch said. The implication is that Desch made the mental-health assessment referral for Minor 1 as she does in every case. While her statement about a mental-health assessment initially seemed to be that it happened for every child, when combined with the State's objected-to follow-up question, confirms she made a mental-health assessment referral for Minor 1.

Wigfall also contends Minor 1's own testimony that she received counseling after she disclosed the abuse was bolstering because it conveyed to the jury that Minor 1 was credible as Minor 1 must have been telling the truth to receive counseling. Neither Desch's testimony about a mental-health assessment nor Minor 1's own testimony that she received some counseling after she revealed that Wigfall was abusing her was bolstering. Both of these testimonies were similar to the testimony given in *Makins*. Wigfall argues that the implication from these testimonies was that Minor 1 was believed or she would not have received counseling. This is the argument the supreme court rejected in *Makins*. To do as Wigfall suggests and infer from Desch's and Minor 1's testimonies that Minor 1 was referred to and attended counseling to mean that Desch found Minor's report of abuse credible would be contrary to our supreme court's decision in *Makins*. *See Makins I*, 433 S.C. at 503, 860 S.E.2d at 671 ("The court of appeals referenced the timing and manner in which [the therapist] affirmed she treated Minor, noting [the therapist's] opinion testimony on the 'various manifestations of child sexual abuse' was 'followed immediately' by her response that she treated Minor, therefore implying [the therapist] believed Minor's allegations." (quoting *Makins II*, 428 S.C.

at 448-49, 835 S.E.2d at 537)); *id.* ("While we do not reject outright the notion that circumstances, such as timing and manner, could possibly contribute to improper bolstering, this [c]ourt has typically focused on the content of the expert's testimony. . . . To suggest [the therapist's] simple affirmation that she provided therapy to Minor can singularly constitute improper bolstering is a bridge too far. In this specific context, [the therapist's] 'yes' alone, without more, did not convey to the jury that [the therapist] believed Minor."). Accordingly, the trial court did not abuse its discretion in allowing these testimonies.[6]

## III. Harmless Error

Wigfall argues the error here was not harmless. He asserts the jury struggled with the case—it deliberated for six hours, asked to be recharged twice, and ultimately, acquitted Wigfall on two of the offenses. He maintains that although Minor 1 claimed the sexual abuse happened frequently for three years and that her brother was always home at the time, her brother did not see any misconduct. Wigfall also argues Mother did not see misconduct when she would come home unexpectedly between shifts. Therefore, he contends the case was dependent upon Minor 1's credibility. Accordingly, he asserts this error was prejudicial and this court should reverse his convictions. We agree.

"An appellate court generally will decline to set aside a conviction due to insubstantial errors not affecting the result." *Kromah*, 401 S.C. at 360, 737 S.E.2d at 501. "[A]n error is harmless beyond a reasonable doubt if it did not contribute to

---

[6] We also disagree with Wigfall's argument "that Desch's say[ing] the recommendation to refer the case for law enforcement and mental health actions was a 'standard' recommendation" amounted to "a comment on the credibility of a class of persons to which the victim belongs" thus making it a comment on Minor 1's credibility. *See Chappell*, 429 S.C. at 78, 837 S.E.2d at 501 (holding an expert witness "improperly commented on the victim's credibility when she testified, 'Children don't often lie about sexual abuse incidents,' because a comment on the credibility of a class of persons to which the victim belongs is a comment on the credibility of the victim"). We take Desch's statement that the recommendations and procedure were standard to mean the same recommendations are made for every child that is brought to the Center. Although Minor 1 is in the class of persons of children brought to the Center, it seems logical that if the interviewers are making the same referrals for every child, they are not undertaking any analysis into whether those children are being truthful. Therefore, we do not read that statement as to all of the children as a statement on those children's credibility.

the verdict obtained." *State v. Collins*, 409 S.C. 524, 537, 763 S.E.2d 22, 29 (2014). "In applying the harmless error rule, the court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such belief beyond a reasonable doubt." *State v. Watts*, 321 S.C. 158, 165, 467 S.E.2d 272, 277 (Ct. App. 1996)

In *Simmons*, our supreme court determined an error in allowing inadmissible hearsay testimony in a CSC with a minor case was subject to a harmless error analysis. 423 S.C. at 565, 816 S.E.2d at 573. "Improper admission of hearsay testimony constitutes reversible error only when the admission causes prejudice." *Id.* at 565-66, 816 S.E.2d at 573 (quoting *State v. Jennings*, 394 S.C. 473, 478, 716 S.E.2d 91, 93 (2011)). "A harmless error analysis is contextual and specific to the circumstances of the case." *Id.* at 566, 816 S.E.2d at 573 (quoting *State v. Byers*, 392 S.C. 438, 447-48, 710 S.E.2d 55, 60 (2011)). "No definite rule of law governs [a finding of harmless error]; rather the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it could not reasonably have affected the result of the trial." *Id.* (alteration in original) (quoting *Byers*, 392 S.C. at 448, 710 S.E.2d at 60). "If a review of the entire record does not establish that the error was harmless beyond a reasonable doubt, then the conviction shall be reversed." *Id.* at 566, 816 S.E.2d at 574.

"The determination whether a bolstering error [prejudiced the outcome of a trial] depends on whether the case turn[ed] on the credibility of the victim." *Chappell*, 429 S.C. at 80, 837 S.E.2d at 502 (alterations in original) (quoting *State v. Chavis*, 412 S.C. 101, 110, 771 S.E.2d 336, 341 (2015)). "The outcome of a trial turns on the credibility of the victim when the State presents no physical evidence or 'relie[s] solely upon the victim's testimony to establish the details of the crime . . . .'" *Id.* (alteration and omission in original) (quoting *Thompson*, 423 S.C. at 248, 814 S.E.2d at 494). "[I]mproper corroboration testimony that is merely cumulative to the victim's testimony cannot be harmless." *Sanchez v. State*, 351 S.C. 270, 275, 569 S.E.2d 363, 365 (2002). "[I]t is precisely this cumulative effect which enhances the devastating impact of improper corroboration." *Thompson*, 423 S.C. at 249, 814 S.E.2d at 494 (alteration in original) (quoting *State v. Barrett*, 299 S.C. 485, 487, 386 S.E.2d 242, 243 (1989)).

In *Chappell*, this court determined that "the outcome of [the defendant's] trial hinged on the jury's assessment of the victim's credibility because the State presented no physical evidence, and the only evidence against [the defendant] was

the victim's uncorroborated testimony."[7]  429 S.C. at 81, 837 S.E.2d at 502.  This court explained, "Because the outcome hinged on the victim's credibility, . . . there is a reasonable probability that the outcome of [the defendant's] trial would have been different had trial counsel objected when [the expert witness] improperly bolstered the victim's credibility."  *Id.* at 81, 837 S.E.2d at 502-03.  This court recognized, "[O]ur courts have found improper bolstering testimony was prejudicial in every South Carolina case in which the State presented no physical evidence of the defendant's guilt or relied solely on the victim's testimony to establish the details of the crime.  We see no reason to depart from those rulings."  *Id.* at 81-82, 837 S.E.2d at 503 (citations omitted).

In *Simmons*, the supreme court observed that "[g]iven that other witnesses . . . testified and provided similar information as provided by [the witness who gave inadmissible hearsay testimony], a harmless error argument may appear plausible."  423 S.C. at 566, 816 S.E.2d at 574.  However, the supreme court provided it was "not able to find the error harmless beyond a reasonable doubt, especially given the critical importance the State assigned to [that witness's] testimony."  *Id.*  The court found the State had "highlighted the testimony of [that witness], calling him as the first witness and emphasizing the importance of his testimony in determining credibility for a case that lacked any physical evidence."  *Id.*  The court noted the State in its closing argument had referenced what that witness had testified to in terms of how the victims described the abuse to him and how that was consistent with other disclosures by the victims.  *Id.*  The supreme court explained, "When boiled down to its essence, '[t]here was no physical evidence presented in this case' and '[t]he only evidence presented by the State was the children's accounts of what occurred and other hearsay evidence of the children's accounts.'"  *Id.* at 567, 816 S.E.2d at 574 (alterations in original) (quoting *Jennings*, 394 S.C. at 480, 716 S.E.2d at 94-95).  The court stated, "It is simply a bridge too far to conclude that [the witness's] improper testimony was harmless beyond a reasonable doubt."  *Id.*; *see also Jennings*, 394 S.C. at 482, 716 S.E.2d at 96 (Kittredge, J., concurring) ("In my judgment, it may be a rare occurrence for the State to prove harmless error beyond a reasonable doubt in these circumstances.").

Here, Minor 1's testimony was the only direct evidence of sexual abuse.  No one testified he or she saw any abuse and the medical evidence provided Minor 1 had no physical signs of trauma.  The text messages did not directly show abuse.  Mother's testimony was not firsthand evidence.  She could only testify that Minor 1

---

[7] *Chappell* was an appeal from the dismissal of an application for post-conviction relief.  429 S.C. at 72, 837 S.E.2d at 498.

told her about the abuse after it had been occurring for three years.  Mother's testimony that she had found Minor 1 in Mother's bedroom with Wigfall, despite not being allowed in there, is also not direct evidence.  Grinnage testified that Minor 1 told her Wigfall was abusing her; she did not witness the abuse.  She only overheard a male voice call out for Minor 1 one time and thought Minor 1's demeanor changed; however, this was not direct evidence.  *See Chappell*, 429 S.C. at 81, 837 S.E.2d at 503 ("[O]ur courts have found improper bolstering testimony was prejudicial in every South Carolina case in which the State presented no physical evidence of the defendant's guilt or relied solely on the victim's testimony to establish the details of the crime."); *Jennings*, 394 S.C. at 480, 716 S.E.2d at 94-95 ("There was no physical evidence presented in this case.  The only evidence presented by the State was the children's accounts of what occurred and other hearsay evidence of the children's accounts.").

Further, the record illustrates the jury struggled with how much of Minor 1's testimony it believed: it deliberated for almost six hours, asked to be recharged first on all the indicted offenses and later on just third-degree CSC with a minor, and acquitted Wigfall of both second-degree CSC with a minor counts but convicted him of third-degree CSC with a minor.  *See State v. Rampey*, 438 S.C. 519, 528, 885 S.E.2d 366, 370-71 (2022) (noting the jury had to decide a "credibility contest" between a victim and a defendant and recognizing the jury's question about lie-detector tests and request to review a transcript of the victim's and another witness's testimonies showed the jury struggled to reach its decision and its ultimate verdict could be seen as a compromise when it convicted the defendant of second-degree CSC yet found him guilty of third-degree CSC); *Lounds v. State*, 380 S.C. 454, 463, 465, 670 S.E.2d 646, 650-52 (2008) (observing that the defendant's credibility was crucial to several of the elements of the one offense for which the jury convicted him, the jury demonstrated it was struggling to reach a verdict by asking to rehear certain testimony and jury charges, and the jury showed it believed some parts of the defendant's testimony instead of a victim's testimony when it acquitted the defendant on one of the two charges); *Greene v. State*, 440 S.C. 165, 182, 889 S.E.2d 636, 645 (Ct. App. 2023) (recognizing that the jury faced competing stories from the victim and the defendant and clearly struggled with the evidence and with who was telling the truth as evidenced by its request to rehear both those testimonies, its initial deadlock on one count, the need for an *Allen*[8] charge, and its inquiry about the possibility of a lesser-included offense).

---

[8] *Allen v. United States*, 164 U.S. 492 (1896).

Because the State's case relied on Minor's 1 credibility and Desch's improperly admitted testimony bolstered her credibility, the error in allowing Desch's testimony concerning law enforcement cannot be harmless.

**CONCLUSION**

Accordingly, because some of the testimony by the forensic interviewer was bolstering and such an error cannot be harmless when this case turns on Minor 1's credibility, Wigfall's convictions and sentences are

**REVERSED.**

**VINSON, J., concurs.**

**MCDONALD, J., concurring in part and dissenting in part:**

While I concur in Section II of the majority opinion, I must respectfully dissent from Section I, Section III, and the resulting reversal of Wigfall's convictions because I do not read Desch's testimony as improperly vouching for or bolstering the victim's testimony. Initially, I disagree with Wigfall's contention—as recognized in the majority opinion—that "Desch recommended the case be staffed by law enforcement," because this was not her testimony.

After the circuit court properly sustained Wigfall's relevance objection to the State's inquiry about whether Desch was "aware of a rule that allows that interview to be played in court," the State inquired:

> Q. Did Minor 1 tell you about being sexually assaulted?
>
> A. Yes.
>
> MS. FORD: Objection. I think this is cumulative, your Honor, based on the bolstering of the other witnesses and everything.
>
> THE COURT: Overruled. I'll allow it as phrased.

Desch then gave appropriate "time and place" testimony addressing Minor 1's disclosures during her interview. *See* Rule 801(d)(1)(D), SCRE, (providing a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (D) consistent with the declarant's testimony in a criminal sexual conduct case or

attempted criminal sexual conduct case where the declarant is the alleged victim and the statement is limited to the time and place of the incident").

The State then asked:

> Q. And when was that last time you saw Minor 1?
>
> A. To my recollection, the last time I saw her was on June 23. Typically when I conduct an interview with a child, I don't have any reason to see them again afterwards and I'm not involved in any of their future services at our center.
>
> Q. Did you make any referrals to her?
>
> A. So we make standard –
>
> MS. FORD: Objection, vouching.
>
> THE COURT: Overruled. Go ahead.
>
> A. At Dee Norton, we [make a] standard recommendation for every child that comes to our center to have their case staffed with our multidisciplinary team so that we can all convene and discuss with the investigators what's going on, as well as referring for a mental-health assessment to see if any ongoing support or treatment is needed after an initial consult.
>
> Q. And is that pretty standard?
>
> A. Yes, ma'am.
>
> Q. Do you know if she followed through with that referral?
>
> A. I don't have those records in front of me, but I have been informed that she did follow up –
>
> MS. FORD: Objection.
>
> THE COURT: Sustained. She can only testify of her own personal knowledge.

MS. FRIES: Thank you.  No further questions.

Wigfall's counsel cross-examined Desch, and the State had no questions on redirect.  The witness never said she "recommended the case be staffed with law enforcement" but instead referenced the "standard recommendation for every child that comes to our center."  In my opinion, this was neither improper bolstering nor improper vouching.

Next, I note there was no objection to the State's introductory questioning regarding Desch's function when interviewing victims referred to the Center.  But had there been such an objection, any resulting error would have been harmless because the only references to law enforcement occurred as follows:

Q.  And as part of your job, do you aid law enforcement in interviewing victims?

A.  Yes, I do.

Q.  Is that a policy that law enforcement needed to help in their investigation?

A.  Yes, it is.

Q.  And in that capacity, did you see Minor 1?

A.  Yes.

Q.  When did you see her?

A.  If you hold on one second, I will pull out my paperwork, because I don't recall the exact date off the top of my head.  So, based on my records, I saw Minor 1 on two separate occasions.  The first was on June 18 of 2020, followed by a second session on June 23 of 2020.

Q.  And why were there two separate sessions?

A.  During Minor 1's initial interview session, we actually took a lot of time in that interview, and there was a medical exam scheduled as well.  So due to timing and wanting to make sure she had the opportunity to complete her medical exam, we halted the interview and

kind of put it on pause and scheduled to come back to finish the interview portion of the appointment.

Q. And who accompanied her to that interview?

A. She was brought to that interview by her mother.

Q. And when accompanied by a parent, do they typically sit in on the interview?

A. No. So a part of the interview process at [the Center] is that family members or caregivers are not allowed to actually be in the interview while it's taking place. It is held one-on-one with myself as the interviewer and the child. And then our law-enforcement partners are able to live observe through closed-caption television. So they can see what's occurring, but they're not actually in the room.

Proper objections followed during the State's subsequent lines of inquiry about the "rule that allows that interview to be played in court" and whether Minor 1 followed through with a treatment referral. The defense appropriately and timely objected to these questions, and the circuit court sustained both objections.

I agree with Wigfall's assertion that the jury struggled with this case—indeed he was acquitted of the two more serious counts of criminal sexual conduct with a minor in the second degree. But I see nothing in Desch's testimony "which necessarily convey[ed] to the jury that the interviewer and law enforcement believe[d] the victim and that their beliefs led to the defendant's arrest, these charges, and this trial, thus impermissibly bolstering the minor's credibility." *State v. Anderson*, 413 S.C. 212, 221, 776 S.E.2d 76, 80 (2015); *see also State v. Barrett*, 416 S.C. 124, 131, 785 S.E.2d 387, 390 (Ct. App. 2016) (distinguishing *Anderson*; noting the challenged witness "did not vouch for Victim's veracity or improperly bolster her testimony"; and finding forensic interviewer never directly or indirectly commented on credibility of victim's accounts, addressed victim's veracity, "or opined whether victim was being truthful"). Thus, I must respectfully dissent from these portions of the majority opinion and from the reversal of Mr. Wigfall's convictions. This was an exceptionally well-run trial. I would affirm both convictions.